THIRD DIVISION

MARCH 29, 2002

No. 1-01-0733

BLESSING/WHITE, INC., NORBERT ) Appeal from the

BLESSING, STROLLER WHITE, and ) Circuit Court of

LINDA WHITE, ) Cook County.

)

Plaintiffs-Appellees, )

)

v. )

)

KENNETH E. ZEHNDER, Director of )

Revenue, and THE STATE OF ILLINOIS )

DEPARTMENT OF REVENUE, ) Honorable

) Joanne L. Lanigan,

Defendants-Appellants. ) Judge Presiding.

JUSTICE CERDA delivered the opinion of the court:

In this administrative review action, defendants, the Illinois Department of Revenue and its director, Kenneth E. Zehnder
(footnote: 1) (Director) (collectively the Department), appeal the order of the circuit court reversing its determination that certain income realized by plaintiffs, Blessing/White, Inc. (BWI), a former New Jersey corporation, its sole shareholders, Norbert Blessing and Stroller White, and Stroller's wife, Linda White (collectively plaintiffs), through the sale of substantially all of BWI's business assets qualified as taxable "business income" under section 1501(a)(1) of the Illinois Income Tax Act (the IITA) (35 ILCS 5/1501(a)(1) (West 2000)).  The principal issue raised by the Department's appeal concerns the proper tax classification of income realized by a non-resident corporation that conducts business activities within Illinois, from a sale of substantially all its business assets where, subsequent to the sale, the corporation ceases its operations and distributes all the sale proceeds to its shareholders.  The Department contends such gain classifies as "business income" under section 1501(a)(1) and is, thus, taxable by the state.  Plaintiffs, on the other hand, claim such gain constitutes nonbusiness income and, as such, falls outside the scope of income taxable under the IITA.  O'Connor Partners, a private partnership, and Nicor, Inc., a private holding company, have been permitted to file an 
amicus
 
curiae
 brief in support of plaintiffs' position.  We agree with plaintiffs and, for the following reasons, affirm the order of the circuit court.

BACKGROUND

The following facts were stipulated to by the parties during the administrative proceedings.

At all times prior to May 1989, BWI was a New Jersey corporation with its principal place of business in Princeton, New Jersey, engaged in the human resource consulting business, providing services mainly to major private businesses and governmental entities.  Specifically, BWI provided instructional programs directed at enhancing the managerial and motivational abilities of its clients' personnel.  As part of its operations, BWI maintained a sales office in Chicago.

On May 31, 1989, BWI sold substantially all of its assets to an unrelated third party for $25,996,758.  The assets involved in the sale consisted primarily of intangible assets, particularly client relationships, customer lists and a variety of proprietary curricula that had been developed by the company over the years.  Per the parties' stipulation, the foregoing assets had been used by BWI in its regular course of business and as part of its income-producing activities in Illinois.

Following the sale, BWI ceased its business activities, including those conducted in Illinois, and distributed nearly all of the sale proceeds to Blessing and White.  Only a small amount of cash and a note retained for collection remained as assets.

On its Illinois income tax return for the tax year ending January 30, 1990, BWI classified the gain realized from the May 1989 sale as nonbusiness income not subject to tax by the State and allocated the gain to its corporate domicile of New Jersey.  Given BWI's classification of the sale proceeds, Blessing and White, both New Jersey residents, did not file Illinois income tax returns for 1990.
(footnote: 2)
 Upon conducting an audit of BWI's 1990 tax filing, the Department reclassified BWI's gain as business income apportionable to Illinois.  The Department thereafter issued notices of tax deficiency to BWI, Blessing and the Whites
(footnote: 3).

Plaintiffs timely protested the Department's reclassification of BWI's gain.  During the administrative proceedings, the parties stipulated to all material facts and exhibits.  In pertinent part, plaintiffs expressly acknowledged that if the Department's classification of the sale proceeds as business income was accurate, the proceeds were apportionable to Illinois and had to be reported to the State as taxable income.

The case was heard and considered by an administrative law judge (ALJ) in mid-1996.  In a written ruling, the ALJ recommended that the Department's classification of BWI's gain be upheld.  The Director agreed with the ALJ's assessment and fully adopted the ALJ's ruling as his decision on February 14, 1996.
(footnote: 4)
 Following the Director's ruling, the Department notified plaintiffs of their respective income tax arrearages.  According to the Department's calculations, BWI owed $31,211, Blessing owed $27,105, and the Whites owed $30,506.

On April 19, 1996, plaintiffs filed a complaint with the circuit court for review of the Department's decision under the Administrative Review Law (Review Law) (735 ILCS 5/3-101 
et
 
seq.
).  By agreement of the parties, the circuit court allowed the case to remain idle while our supreme court considered the case of 
Texaco-Cities Service Pipeline Co. v. McGaw
, 182 Ill. 2d 262, 695 N.E.2d 481 (1998).  Following resolution of that matter
, the circuit court concluded BWI's gain realized from the 1989 asset sale constituted nonbusiness income and, hence, was not taxable in Illinois.  Accordingly, the circuit court reversed the Department's decision.

The Department's timely appeal followed.

ANALYSIS

The principle issue here is whether the Department's characterization of BWI's gain from the 1989 asset sale as "business income" was accurate.  The IITA, derived from the Uniform Division of Income for Tax Purposes Act (UDITPA), addresses when income of a non-resident corporation conducting business within Illinois is subject to taxation by the state.  Under the statute, foreign corporations are required to pay taxes in proportion to the amount of its income-producing activities.  35 ILCS 5/304(a) (West 2000); 
Texaco-Cities Service Pipeline Co. v. McGaw
, 182 Ill. 2d 262, 268, 695 N.E.2d 481, 484 (1998)
; 
Automatic Data Processing, Inc. v. Illinois Dept. of Rev.
, 313 Ill. App. 3d 433, 438, 729 N.E.2d 897, 902 (2000).

Essentially, the IITA establishes two methods by which corporate income will be divided among Illinois and the other jurisdictions in which the taxpayer conducts business.  These two methods are "apportionment" and "allocation," and the particular method by which the taxpayer's income will be divided turns upon whether the income is classified as "business income" or nonbusiness income."

"Business income" is defined as:

"income arising from transactions and activity in the regular course of the taxpayer's trade or business ***, and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."  35 ILCS 5/1501(a)(1) (West 2000).
(footnote: 5)
Income falling within the purview of the foregoing definition is subject to apportionment in Illinois through use of a three-factor formula that takes into account the corporation's property, payroll and sales.  35 ILCS 5/304(a)(1), (a)(2), (a)(3) (West 2000).

Any income not deemed to be business income is considered nonbusiness income.  35 ILCS 5/1501(a)(13) (West 2000).  For taxing purposes, nonbusiness income is allocated to a particular state, generally the state in which the corporation is domiciled or in which the income-producing property is situated.  35 ILCS 5/303 (West 2000); 
Automatic Data
, 313 Ill. App. 3d at 438, 729 N.E.2d at 902.

Following the approach of other jurisdictions that have adopted the UDITPA, our supreme court has recognized that section 1501(a)(1) of the IITA encompasses two alternative and distinct approaches for determining whether gain realized from the sale of a capital asset may be apportioned.  The first, or "transactional" test, is reflected by the first clause of the definition stating that business income is "income arising from transactions and activity in the regular course of the taxpayer's trade or business."  
Texaco-Cities
, 182 Ill. 2d at 268, 695 N.E.2d at 484.  The second, or "functional" test, is embodied in the second clause which reads that business income "includes income from tangible or intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."  
Texaco-Cities
, 182 Ill. 2d at 268, 695 N.E.2d at 484.
(footnote: 6)
 As explained by the supreme court, the transactional test classifies income as business income if the gain is "attributable to a type of business transaction in which [the] taxpayer regularly engages."  
Texaco-Cities
, 182 Ill. 2d at 269, 695 N.E.2d at 484.  Under this approach, the use or function of the asset sold is not determinative.  
General Care Corp. v. Olsen
, 705 S.W.2d 642, 645 (Tenn. 1986); 
Western Natural Gas Co. v. McDonald
, 446 P.2d 781, 783 (Kan. 1968).  Rather, it is the nature, frequency and regularity of the income-generating transaction that define the test.  
Texaco-Cities
, 182 Ill. 2d at 269, 695 N.E.2d 484; see also 
Ross-Araco Corp. v. Commonwealth of Pennsylvania
, 674 A.2d 691, 693 (Pa. 1996) ("[t]he transactional test measures the particular transaction against the frequency and regularity of similar transactions in the past practices of the business").
(footnote: 7)
 As the parties submit, BWI's gain from the asset sale in question does not constitute business income under the transactional approach since asset liquidations accompanied by a cessation of business activity, like that undertaken by BWI here, is an extraordinary and uncommon corporate event not typically occurring within a corporation's regular course of operations.  See 
Hoechst Celanese Corp. v. Franchise Tax Bd.
, 22 P.3d 324, 337 (Cal. 2001) ("income arising from 'extraordinary' events such as a 'complete liquidation and cessation of business' cannot satisfy the transactional test"); 
Ex parte Uniroyal Tire Co.
, 779 So. 2d 227, 236 (Ala. 2000) ("[a] complete liquidation and cessation of business do not generate business income under the transaction test *** because, by definition, such events are most extraordinary; they do not occur in the 'regular course of the taxpayer's trade or business'").

The functional test, as noted, provides that income is business income where the "acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."  The express wording of the IITA indicates that the acquisition, management 
and
 disposition of the property at issue must constitute integral parts of the taxpaying corporation's business operations.  Under this construction of the statute, income is apportionable as business income under the functional test only if the income-generating transaction (
i.e.
, the disposition), as well as the taxpayer's relationship to the property before disposition (
i.e.
, acquisition and management), are integral to the corporation's regular operations.  See 
Texaco-Cities
, 182 Ill. 2d at 280-81, 695 N.E.2d at 490 (Bilandic, J., dissenting).

The majority opinion in 
Texaco-Cities
, yet, embraced a different view.  At first blush, the court's decision seems to adopt the construction of the statute discussed above.  The majority specifically explained that the functional approach classifies all gain from the disposition of a capital asset as income "if the asset disposed of was used by the taxpayer in its regular trade or business operations."  
Texaco-Cities
, 182 Ill. 2d at 268, 695 N.E.2d at 484.  In construing the express wording of the act, the majority determined that "the acquisition, management 
and
 disposition of the income-producing property must closely relate to the taxpayer's regular trade or whole process of operating its business."  (Emphasis added.)  
Texaco-Cities
, 182 Ill. 2d at 271, 695 N.E.2d at 485.  In this regard, the court stated "the words 'acquisition, management, and disposition' suggest elements typically associated with the 'keeping' of corporate property, or *** the 'conditions of ownership' of corporate property."  
Texaco-Cities
, 182 Ill. 2d at 271, 695 N.E.2d at 485.  Thus, according to the majority, "the sale of property will constitute business income 
if
 
the
 
property
 
and
 
sale
 
are
 
essential
 [
i.e.
, integral] to the taxpayer's business operations."  (Emphasis added.)  
Texaco-Cities
, 182 Ill. 2d at 271, 695 N.E.2d at 485.

Further examination of the 
Texaco-Cities
 decision, however, reveals the majority believed the paramount inquiry was not whether the property 
and
 disposition were essential but, rather, only whether the property itself was 
integral to the corporation's business.  In addressing the taxpayer's argument that the second clause of the "business income" definition mandates that the taxpayer "'emphasize the trading of the sold asset as an integral part of its regular business," the majority stated:

"We think that, had the legislature intended for this section to be confined to taxpayers who routinely trade assets, or to gain from the sale of inventory, it could have said so.  [The taxpayer's] construction narrowly focuses upon the 'regularity' or frequency of the transaction that produced the income.  Instead, the reach of the second clause is much broader, directed toward the use 
or
 disposition of the property as forming an integral part of the taxpayer's business."  (Emphasis added.)  
Texaco-Cities
, 182 Ill. 2d at 271, 695 N.E.2d at 486.

The 
Texaco-Cities
 majority seemed to refine the scope of the functional test even more when it continued:

"The functional test classifies as business income all gain from the disposition of a capital asset if the asset was 'used by the taxpayer in its regular trade or business operations. *** [T]he second clause of section 1501(a)(1) 
focuses
 
upon
 
the
 
role
 
or
 
function
 
of
 
the
 
property
 
[disposed
 
of]
 
as being
 
integral
 
to
 
regular
 
business
 
operations
.  The use of a capital asset in the taxpayer's regular trade or business indisputably renders that asset an integral part of the taxpayer's regular business operations."  (Emphasis added.)  
Texaco-Cities
, 182 Ill.2d at 272, 695 N.E.2d 486.

The court further added that "the extraordinary nature or infrequency of the sale is irrelevant" in applying the functional approach.  
Texaco-Cities
, 182 Ill. 2d at 269, 695 N.E.2d at 485.

The court's analysis of the case before it confirms that the use of the property by the taxpayer is the focal point of the functional test.  The taxpayer in 
Texaco-Cities
, Texaco-Cities Service Pipeline Company, was in the business of transporting crude oil and other petroleum products by pipeline.  As part of its business, Texaco-Cities owned and operated pipelines that ran through several states, including Illinois.  During the 1983 tax year, Texaco-Cities sold major segments of its pipeline assets and, specifically, its entire contingent of assets in Illinois.  As a result, Texaco-Cities realized a nearly 90% reduction in its total pipeline miles and generated a gain of $9,987,176.

Texaco-Cities reported the income from its sale as nonbusiness income on its return for the 1983 tax year.  The Illinois Department of Revenue audited Texaco-Cities' tax returns and, based thereupon, assessed a tax deficiency against the company.  The revenue department reclassified the gain as "business income" subject to apportionment under the IITA, finding the sale to have constituted an integral part of Texaco-Cities' business operations.  Texaco-Cities' protest to the reclassification proved unsuccessful and the company filed for administrative review.

In a four-to-three decision, the supreme court, analyzing the case under the functional approach, held the gain realized by Texaco-Cities represented apportionable income under the IITA:

"According to Texaco-Cities' tax return for the year in question, its business was 'pipeline transportation.'  The pipelines sold were among several that Texaco-Cities employed to transport petroleum and other substances in its regular course of business.  There was no dispute that they were used for the production of business income."  
Texaco-Cities
, 182 Ill. 2d at 273, 695 N.E.2d at 486.

Certainly, in its application of the functional test, the majority opinion focused solely on the property and particularly whether Texaco-Cities' pipeline assets were essential to the company's operations, 
i.e.
, whether the pipelines were "used by the taxpayer in its regular trade or business operations."  In evaluating the significance of the subject pipeline to the company's business activities, the majority noted the pipeline assets had generated income for the company during the course of their utilization.
(footnote: 8)  No where in the majority's analysis is it apparent that the court concerned itself with whether the sale of the pipelines was also integral to the company's business.
  See 
Texaco-Cities
, 182 Ill. 2d at 280, 695 N.E.2d at 490 (Bilandic, J., dissenting) (noting the majority's holding that "to satisfy the functional test for business income, the property that is sold must simply be property that was "'used by the taxpayer in its regular trade or business operations'").

The 
majority's discussion and application of the functional approach in 
Texaco-Cities
 indicates the functional test for business income is satisfied where the asset disposed of was used by the taxpayer as an integral part of its regular trade or business operations.  In determining whether the subject asset was integral, particular attention is given to whether the asset generated income for the company during its period of utilization.  The relevant focus is on the property and use thereof by the taxpayer, and the nature of the particular transaction engaged in is 
typically
 of no concern.
(footnote: 9)  We say "typically" because further examination of the 
Texaco-Cities
 opinion reveals that the majority believed application of a modified form of the functional test is appropriate when the disposition of assets was made pursuant to a corporate liquidation in cessation of business.

After characterizing the pipeline assets sold by Texaco-Cities to be income-producing property while held by the company, the 
Texaco-Cities
 majority examined and distinguished the Pennsylvania supreme court decision of 
Laurel Pipe Line Co. v. Commonwealth
, 642 A.2d 472 (Pa. 1994), the principal authority relied on by Texaco-Cities in arguing for nonapportionment.  In 
Laurel Pipe Line
, the court, adopting both the transactional and functional tests, considered the issue of whether the proceeds from the sale of an independent pipeline held by a company engaged in the petroleum product transportation business constituted business or nonbusiness income under statutory apportionment provisions nearly identical to those contained in the IITA.  As part of its business activities, the taxpaying corporation operated several pipelines, including a pipeline that extended from Aliquippa, Pennsylvania to Cleveland, Ohio.

After discontinuing operation of the Aliquippa-Cleveland pipeline in 1983, the taxpayer sold the pipeline, along with related assets, in late 1986 for a gain of $3,766,047.  Shortly thereafter, the proceeds from the sale were distributed to the company's stockholders.  No amount of the sale proceeds was reinvested back into the company's ongoing business activities.

The issue before the 
Laurel Pipe Line
 court was whether the Pennsylvania department of revenue's classification of the taxpayer's gain represented apportionable business income for tax purposes.  Considering the issue strictly within the parameters of the functional test, the court held the gain realized on the pipeline's sale was nonbusiness income.  
Laurel Pipe Line
, 642 A.2d at 477.  While initially explaining that the functional test will be satisfied "if the gain arises from the sale of an asset which produced business income while it was owned by the taxpayer," the court nevertheless found the nature of the transaction engaged in by the taxpayer significant, explaining the "statutory definition of business income requires that 'the acquisition, management, 
and
 
disposition
 of the property constitute integral parts of the taxpayer's 
regular
 trade or business operations.'"  (Emphasis in original.)  
Laurel Pipe Line
, 642 N.E.2d at 475.  In this regard, the court commented:

"The Aliquippa-Cleveland pipeline had been idle for over three years prior to the time that it was sold.  In our view, the pipeline was not disposed of as an integral part of *** [the taxpayer's] regular trade or business.  Rather, the effect of the sale was that the company liquidated a portion of its assets.  This is evidenced by the fact that the proceeds of the sale were not reinvested back into the operations of the business, but were distributed entirely to the stockholders of the corporation.  Although *** [the taxpayer] continued to operate a second, independent pipeline, the sale of the Aliquippa-Cleveland pipeline constituted a liquidation of a separate and distinct aspect of its business."  
Laurel Pipe Line
, 642 A.2d at 475.

To the 
Laurel Pipe Line
 court, the disposition of the property, in addition to the property itself, had to be integral to the taxpayer's regular operations for the gain generated by the disposition to qualify as business income under the functional test.  Since the sale of the Aliquippa-Cleveland pipeline was not essential to the taxpayer's business, the gain was deemed not taxable.

In finding 
Laurel Pipe Line
 distinguishable, the majority in 
Texaco-Cities
 cited the effects the subject transactions had on each of the taxpayer's respective business as well as the taxpayers' respective use of the proceeds generated by the sales.  The majority explained the sale consummated by Texaco-Cities, unlike the transaction involved in 
Laurel Pipe Line
, did not represent a liquidation and cessation of Texaco-Cities business operations or a distinct and separate portion thereof.  
Texaco-Cities
, 182 Ill. 2d at 273-74, 695 N.E.2d at 487.  Rather, the majority stressed, Texaco-Cities, following the sale, "remained primarily in the business of providing transportation by pipeline, and that the sales proceeds were invested right back into the business rather than being disseminated to its shareholders."  
Texaco-Cities
, 182 Ill. 2d at 273, 695 N.E.2d at 486-87.

The supreme court's treatment of the 
Laurel Pipe Line
 decision is significant and suggests the functional test assumes a different application in cases where the taxpayer's disposition of assets amounts to a corporate liquidation in cessation of business.  Notably, the 
Laurel Pipe Line
 court applied a functional test that considered the importance of both the property and transaction to the taxpaying corporation.  Yet, the 
Texaco-Cities
 majority did not distinguish 
Laurel Pipe Line
 on that basis but, rather, cited the discontinuation of the taxpayer's business and the distribution, as opposed to reinvestment, of the sale proceeds.  Neither did the majority cite the extraordinary nature of the transaction engaged in by 
Laurel Pipe Line
 taxpayer.  Certainly, the court's handling of 
Laurel Pipe Line
 raises the question of whether the majority would have reached a different conclusion had Texaco-Cities ceased its pipeline activities, either in whole or part, and distributed the sale proceeds to its stockholders.  
Texaco-Cities
, in our view, tacitly recognizes the distinctive nature of corporate liquidations resulting in a discontinuation of business activity and suggests that the functional test will be met in such cases only where the property 
and
 the liquidation of assets (
i.e.
 disposition) are essential to the taxpayer's regular trade or operations.
(footnote: 10)
 Turning to the merits of the Department's appeal, we first discuss the applicable standard of review.  Under the Administrative Review Law (735 ILCS 5/301 
et
 
seq.
 (West 2000)), we review the final decision of the administrative agency and not the decision of the circuit court.  
Hercules, Inc. v. Department of Rev.
, 324 Ill. App. 3d 329, 335, 753 N.E.2d 418, 424 (2001).  We consider all questions of law and fact presented by the record (735 ILCS 5/3-110 (West 2000)), and the standard of review applied by this court turns on the proper characterization of question presented.  
City of Belvidere v. Illinois State Labor Relations Bd.
, 181 Ill. 2d 191, 204, 692 N.E.2d 295, 302 (1998).

Deference is afforded the agency's findings of fact and they will not be disturbed unless against the manifest weight of the evidence.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  Agency determinations involving mixed questions of fact and law are also provided a degree of deference and are reviewed pursuant to a clearly erroneous standard.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  Determinations of law, conversely, are not afforded deference and are reviewed on a 
de
 
novo
 basis.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.

The parties here disagree as to the proper characterization of the Department's decision.  The Department characterizes its ruling as a mixed question of fact and law and, therefore, urges for review under the clearly erroneous standard.  Plaintiffs, on the other hand, assert the absence of any factual dispute as a result of the parties' stipulation required the Department to determine only a question of law.  Plaintiffs, therefore, advocate use of a 
de
 
novo
 standard of review.

In 
City of Belvidere
, the supreme court applied the clearly erroneous standard in reviewing the ruling of the Illinois State Labor Relations Board (ISLRB) that found the City of Belvidere guilty of an unfair labor practice under the Illinois Public Relations Act when it refused to bargain with a firefighters union concerning its decision to contract out paramedic services to a private company.  Characterizing the ISLRB's ruling as a mixed question of fact and law, the court explained the board's determination was, in part, factual because it involved a consideration of whether the facts supported a finding that the city's decision "affected wages, hours and other conditions of employment (
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302), a primary consideration in determining an employer's duty to bargain under the labor act.  While the evidence in this respect was undisputed, the ISLRB was nonetheless required to make certain factual findings.  In particular, the board had to examine the evidence and ascertain: whether the city had an established operating procedure and, if so, whether the city's decision constituted a departure from that practice; the conditions of the firefighters' employment and how they were affected by the city's decision (
i.e.
, whether the firefighters were deprived of potential work or promotional opportunities); and whether the firefighters, by the nature of their position, had a reasonable expectation to provide paramedic services to the city's residents.  
City of Belvidere
, 181 Ill. 2d at 201, 692 N.E.2d at 300.

The supreme court further explained the ISLRB's decision also involved a question of law because the statutory phrase "wages, hours and other conditions of employment" is a legal term that required interpretation.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.  Stating a mixed question of fact and law was presented by the agency's decision "because *** [the] case involve[d] an examination of the legal effect of a given set of facts," the court reviewed the agency's determination for clear error.  
City of Belvidere
, 181 Ill. 2d at 205, 692 N.E.2d at 302.

The Department contends that the instant case, like the case in 
City of Belvidere
, concerns the legal effect of a given set of facts and, thus, represents a mixed question to be reviewed under the clearly erroneous standard.  We disagree.  While the facts before the Department, like the facts before the ISLRB, were not in dispute, the Department was not required, like the labor board, to draw any additional factual findings from the evidence.  The only issue before the Department was whether BWI's gain from the 1989 asset sale constitutes business income under the functional test.  Not only did the parties stipulate that the disposed assets produced income for BWI and, thus, were essential to the company's business, the parties further stipulated that BWI ceased its activities in Illinois and distributed the sale proceeds to the company's shareholders shortly after the transaction.  Under these circumstances, the Department's decision represents a legal determination subject to 
de
 
novo
 review.  See 
Taylor v. Cook County Sheriff's Merit Bd.
, 316 Ill. App. 3d 574, 579, 736 N.E.2d 673, 677 (2000) ("[t]he legal effect of undisputed facts is a question of law, and the appellate court considers the propriety of the determination 
de
 
novo
").
(footnote: 11)
 While the record demonstrates that the assets disposed of were essential to BWI's regular operations, it wholly fails to show that the disposition of those assets was equally important to the company.  The disposition amounted to a liquidation of BWI's business property, reflecting an extraordinary, one-time corporate event and marking the cessation of the company's business activities including those conducted in Illinois.  Significantly, the liquidation proceeds were not used to support any ongoing business concerns but, instead, disbursed in their entirety to the company's shareholders.  Since the liquidation of BWI's assets was not integral to the company's regular business operations, BWI's gain does not qualify as business income under the functional approach.  See 
Lenox
, 548 S.E.2d at 519-20 (finding gain realized by taxpayer's liquidation of separate and distinct portion of business operations did not constitute business income under functional approach where the liquidation resulted in taxpayer's complete departure from the fine jewelry business and where the sale proceeds were distributed to the taxpayer's sole shareholder and not used to support any ongoing business activities); 
Kemppel
, 746 N.E.2d at 1076 (finding taxpayer's gain not business income under functional test where gain resulted from liquidation of assets followed by a dissolution of the corporation); cf. 
Texaco-Cities
, 182 Ill. 2d at 273, 695 N.E.2d at 486-87.  BWI's gain is therefore best classified as nonbusiness income under the IITA and, as such, is not taxable in Illinois.

CONCLUSION

For the foregoing reasons, the order of the circuit court reversing the Department's decision is affirmed.  Because of our holding, we need not address the constitutional arguments against apportionment raised by the 
amici
.

Affirmed.

HALL, P.J., and WOLFSON, J., concur.

FOOTNOTES
1:
Glen Bower has replaced Zehnder as the Department's director.

2:
Because BWI operated as a subchapter S corporation pursuant to the Internal Revenue Code, BWI's earnings were attributable for certain tax purposes to its shareholders Blessing and White.

3:     
 Stroller's wife, Linda, is party to the instant case by reason of filing a joint federal income tax return with her husband for the tax period in question.

4:     
 According to the record, BWI's gain from the 1989 asset sale encompassed both capital gains and interest income.  During the administrative proceedings, the Department conceded its classification of BWI's interest income as taxable income was not supported by the evidence.

5:     
 This definition is virtually identical to the definition contained in section 1(e) of the UDITPA.  
Texaco-Cities
, 182 Ill. 2d at 268, 695 N.E.2d at 484.

6:
A small number of jurisdictions with tax statutes substantially similar to the apportionment/allocation provisions of the UDITPA and IITA have construed the definition of "business income" to embody the transactional test only.  See 
Hoeschst Celanese Corp. v. Franchise Tax Bd.
, 22 P.3d 324, 334 n.6 (Cal. 2001) (citing jurisdictions).

7:
Some courts also consider the corporate taxpayer's subsequent use of the income, 
i.e.
, whether the income is reinvested into the continuing business operations of the company or whether the funds are distributed to the company's shareholders.  See 
Kemppel v. Zaino
, 746 N.E.2d 1073, 1076 (Ohio 2001); 
The May Department Stores Co. v. Indiana Dept. of State Rev.
, 749 N.E.2d 651, 658 (Ind. Tax Ct. 2001); 
Polaroid Corp. v. Offerman
, 507 S.E.2d 284, 289 (N.C. 1998).

8:
Other courts applying the functional test have stated that the asset's production of income while it was owned by the taxpayer is a central consideration in determining whether the functional approach has been met.  See 
Kemppel
, 746 N.E.2d at 1076; 
Ross-Araco
, 674 A.2d at 693

9:
Other courts have expressed substantially similar descriptions of the functional test.  See 
Kemppel
, 746 N.E.2d at 1076 (income is classified as business income under the functional test if "use of the property constituted an integral part of the regular course of a trade or business operation"); 
Hoechst
, 22 P.3d at 340 (the functional approach focuses on the income-producing property and classifies gain as business income "if the taxpayer's acquisition, control and use of the property contribute materially to the taxpayer's production of business income"); 
Ross-Araco
, 674 A.2d at 693 ("income is business income if the gain arises from the sale of an asset that produced business income while it was owned by the taxpayer"); 
District of Columbia v. Pierce Associates, Inc.
, 462 A.2d 1129, 1131 (D.C. App. Ct. 1983) 
("[i]f the property had an integral function in the taxpayer's unitary business, its income properly can be apportioned and taxed as business income, even though the transaction itself does not reflect the taxpayer's normal trade or business").  Other courts, construing the plain language of their respective income tax statutes, focus not only on the property as being essential to the taxpayer's business operations, but the disposition of that property as well.  See 
May
, 749 N.E.2d at 664; 
Willamette Industries, Inc. & Subsidiaries v. Department of Rev.
, 15 P.3d 18, 21 (Or. 2000).

10:
The high courts of North Carolina and Ohio also apply a modified functional approach in cases involving liquidations.  See 
Lenox, Inc. v. Tolson
, 548 S.E.2d 513, 519-20 (N.C. 2001) ("when an asset is sold pursuant to a complete or partial liquidation, the court must focus on more than the question of whether the asset was integral to the corporation's business"); 
Kemppel
, 746 N.E.2d at 1076-77.  The North Carolina supreme court has expressly placed liquidations in a category by themselves since they are "not in furtherance of the unitary business, but rather a means of cessation."  
Polaroid
, 507 S.E.2d at 296 n.6.

11:
We do not believe 
City of Belvidere
 holds, as suggested by the Department, that a mixed question of fact and law is always presented whenever a case involves "an examination of the legal effect of a given set of facts."  In essence, every case involves such an examination.  The supreme court's statements in 
City of Belvidere
 must be read in its proper context and with the understanding that while the facts before the agency there were not in dispute, the agency was nevertheless required to draw further findings from the evidence.