NO. 4-06-0148     Filed 1/19/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| NATIONAL HOLDINGS, INC., | ) | Appeal from |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Sangamon County |
| KENNETH E. ZEHNDER, Director of the | ) | No. 98CH443 |
| Department of Revenue of the State of | ) | |
| Illinois; and JUDY BAAR TOPINKA, | ) | Honorable |
| Illinois State Treasurer, | ) | John W. Belz, |
|     Defendants-Appellants. | ) | Judge Presiding. |

_____

JUSTICE TURNER delivered the opinion of the court:

In October 1998, plaintiff, National Holdings, Inc. (National Holdings), filed a complaint pursuant to the State Officers and Employees Money Disposition Act (Act) (30 ILCS 230/1 through 6a (West 1998)) against defendants, Kenneth E. Zehnder, Director of the Department of Revenue of the State of Illinois, and Judy Baar Topinka, Illinois State Treasurer (collectively Department), following the Department's notice of income-tax deficiency under the Illinois Income Tax Act (Income Tax Act) (35 ILCS 5/101 through 1701 (West 1994)). National Holdings made a protested payment of $527,549 pursuant to the Act. The parties later filed cross-motions for summary judgment, and in January 2006, the trial court granted summary judgment in favor of National Holdings.

On appeal, defendants argue the trial court erred in holding National Holdings' gain was nonbusiness income. We affirm.

## I. BACKGROUND

At all times relevant to the litigation, all of the capital stock of National Holdings was owned and controlled by Loblaw Companies, Ltd. (Loblaw), a Canadian company. National Holdings, a Delaware corporation, owned 100% of the capital stock of National Tea Co. (National Tea), an Illinois corporation. National Tea owned 100% of the capital stock of National Super Markets, Inc. (Super Markets), a Michigan corporation. Prior to June 1995, National Tea and Super Markets were engaged in the retail grocery business with stores in several states, including 15 in Illinois. National Tea and Super Markets, along with other affiliated corporations, filed combined Illinois income-tax returns as a unitary business group. National Holdings paid Illinois income tax on that part of the group's income apportioned to Illinois.

On June 12, 1995, Super Markets and National Tea conveyed title and ownership of their assets to Schnuck Markets, Inc., pursuant to an asset-purchase agreement and received payment of $398,798,000. Of that amount, $191,368,465 was retained in a liability reserve for Super Markets and National Tea to pay certain historical liabilities. The net proceeds of the sale totaled $207,429,535. Super Markets and National Tea ceased to operate their retail grocery business and were thereafter involved only in the collection of receivables, the payment of liabilities, and other administrative activities.

On September 25, 1995, Super Markets distributed all of

its assets to National Tea, and its corporate existence under Michigan law terminated.  On September 29, 1995, National Tea's board of directors declared the net proceeds from the sale of the stores totaling $207,429,535 as a dividend and paid it all to National Holdings.

In November 1995, National Holdings contributed the net-sale proceeds to Glendel, Inc. (Glendel), a wholly owned subsidiary of Loblaw.  Glendel's only assets consisted of those proceeds, which were invested by a third-party fiduciary in interest-bearing debt securities that included United States treasury bills, bonds, notes, and other low-risk government securities.  None of the proceeds from the sale of assets was ever used in conducting business in the United States.  The sale represented a complete disposition of Loblaw's retail business in the United States.

In October 1996, National Holdings filed a combined Illinois income-tax return for itself and its subsidiaries that included National Tea and Super Markets.  On its 1995 return, National Holdings reported nonbusiness income of $100,888,747 from the sale of Super Markets' and National Tea's retail grocery-store assets.  Of that amount, $7,834,664 was allocated as taxable nonbusiness Illinois income.  None of the income from the sale of assets to Schnuck Markets was reported as business income in filing any state income-tax return outside Illinois.

In September 1998, upon audit of National Holdings' 1995 Illinois income-tax return, the Department's auditor rechar-

acterized the $100,888,747 gain from the sale of assets as apportionable business income. The Department determined its decision resulted in $13,855,455 in additional income being apportioned to Illinois. Thereafter, the Department issued a notice of deficiency to National Holdings, asserting a deficiency of $527,549 that consisted of $446,671 in taxes plus $80,878 in interest. National Holdings paid the amount under protest (see 30 ILCS 230/2a (West 1998)) and filed its complaint contesting the Department's characterization of the gain as business income. The trial court later enjoined defendants from transferring the money into the treasury's general fund.

In June 2005, the parties jointly filed a stipulation of facts and agreed the sole issue was whether the gain from the sale of the retail grocery stores constituted business or non-business income as defined by section 1501(a)(1) of the Income Tax Act (35 ILCS 5/1501(a)(1) (West 1994)). In September 2005, National Holdings filed a motion for summary judgment. In October 2005, defendants filed their motion for summary judgment.

In January 2006, the trial court found for plaintiff and against defendants. The court found National Tea and Super Markets sold all their assets to Schnuck Markets in June 1995 and all proceeds of this liquidation sale were distributed to National Holdings. Also, these proceeds were never used to conduct business in the United States and were distributed to shareholders. Based on case law and the plain language of section 1501(a), the court held the gain from the asset sale was nonbusi-

- 4 -

ness income because it was a cessation of a business and not used in National Holdings' ongoing business operations.  This appeal followed.

## II. ANALYSIS

### A. Standard of Review

"Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd., 216 Ill. 2d 294, 305, 837 N.E.2d 99, 106 (2005).  When both parties move for summary judgment, "they agree that (1) no material issue of fact exists; and (2) only a question of law is involved."  Subway Restaurants of Bloomington-Normal, Inc. v. Topinka, 322 Ill. App. 3d 376, 381, 751 N.E.2d 203, 208 (2001).  On appeal, our review of a trial court's order granting summary judgment is de novo.  Harrison v. Hardin County Community Unit School District No. 1, 197 Ill. 2d 466, 470-71, 758 N.E.2d 848, 851 (2001).

### B. Business or Nonbusiness Income

Defendants argue the trial court erred in finding National Holdings' gain was nonbusiness income.  We disagree.

The Income Tax Act, derived from the Uniform Division of Income for Tax Purposes Act (UDITPA), "addresses when income of a nonresident corporation conducting business within Illinois

- 5 -

is subject to taxation by the State."  <u>American States Insurance Co. v. Hamer</u>, 352 Ill. App. 3d 521, 525, 816 N.E.2d 659, 663 (2004); see also <u>Blessing/White, Inc. v. Zehnder</u>, 329 Ill. App. 3d 714, 718, 768 N.E.2d 332, 336 (2002).  "Under the statute, foreign corporations are required to pay taxes in proportion to the amount of their income-producing activities."  <u>American States</u>, 352 Ill. App. 3d at 525-26, 816 N.E.2d at 663.

The Income Tax Act establishes two methods, apportionment and allocation, by which corporate income will be divided among Illinois and other jurisdictions wherein the taxpayer conducts business.  <u>American States</u>, 352 Ill. App. 3d at 526, 816 N.E.2d at 663; <u>Blessing/White</u>, 329 Ill. App. 3d at 718-19, 768 N.E.2d at 336.

> "When income is allocated, it is all assigned to one particular state for taxing purposes, generally the commercial domicile of the company or the situs of the income-producing property.  35 ILCS 5/303 (West 1996).  When a business' income is apportioned, it is divided up for taxing purposes among the various states in which the business operates. 35 ILCS 5/304(a) (West 1996).  Apportionment is intended to assign the amount of income to a state that is proportional to the amount of income-producing activities in that state. Business income is apportioned and nonbusi-

ness income is allocated."  Automatic Data Processing, Inc. v. Department of Revenue, 313 Ill. App. 3d 433, 438, 729 N.E.2d 897, 902 (2000).

The taxpayer bears the burden of establishing that income is nonbusiness income.  Texaco-Cities Service Pipeline Co. v. McGaw, 182 Ill. 2d 262, 268, 695 N.E.2d 481, 484 (1998).

Prior to July 30, 2004, the Income Tax Act defined "business income" as:

"income arising from transactions and activity in the regular course of the taxpayer's trade or business ***, and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."  35 ILCS 5/1501(a)(1) (West 1994).

Income falling within this definition is subject to apportionment through the use of a three-factor formula that takes into account the corporation's property, payroll, and sales.  American States, 352 Ill. App. 3d at 526, 816 N.E.2d at 663; Blessing/White, 329 Ill. App. 3d at 719, 768 N.E.2d at 336.  We note that, effective July 30, 2004, the General Assembly amended section 1501(a)(1) and now defines "business income" as "all income that may be treated as apportionable business income under the Constitution of the United States."  35 ILCS 5/1501(a)(1) (West 2004).

- 7 -

"Nonbusiness income" has been defined as "all income other than business income or compensation." 35 ILCS 5/1501(a)(13) (West 1994). "For taxing purposes, nonbusiness income is allocated to a particular state, generally the state in which the corporation is domiciled or in which the income-producing property is situated." American States, 352 Ill. App. 3d at 526, 816 N.E.2d at 663.

Both parties acknowledge, as did the trial court, that the seminal case interpreting the terms "business income" and "nonbusiness income" as defined in section 1501(a) is our supreme court's decision in Texaco-Cities. In that case, the court followed the approach of other jurisdictions that have adopted UDITPA and found the earlier version of section 1501(a)(1) encompassed two alternative and distinct approaches for determining whether gain realized from the sale of a capital asset may be apportioned. Texaco-Cities, 182 Ill. 2d at 268, 695 N.E.2d at 484. The first approach, the "transactional" test, is reflected in the first clause of the definition stating business income is "income arising from transactions and activity in the regular course of the taxpayer's trade or business." 35 ILCS 5/1501(a)(1) (West 1994); Texaco-Cities, 182 Ill. 2d at 268, 695 N.E.2d at 484. In the case sub judice, the Department does not contend the gain at issue constitutes business income under the transactional test. Instead, the Department argues National Holdings' gain from the sale of National Tea's and Super Markets' assets constitute business income under the functional test.

- 8 -

Under that second approach, the "functional" test, found in the second clause of section 1501(a)(1), business income is defined as including "income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations."  35 ILCS 5/1501(a)(1) (West 1994); Texaco-Cities, 182 Ill. 2d at 270, 695 N.E.2d at 485.  The supreme court noted "the words 'acquisition, management, and disposition' suggest elements typically associated with the 'keeping' of corporate property, or *** the 'conditions of ownership' of corporate property."  Texaco-Cities, 182 Ill. 2d at 271, 695 N.E.2d at 485.

> "The functional test classifies as business income all gain from the disposition of a capital asset if the asset was 'used by the taxpayer in its regular trade or business operations.'  ***  [T]he second clause of section 1501(a)(1) focuses upon the role or function of the property [disposed of] as being integral to regular business operations.  The use of a capital asset in the taxpayer's regular trade or business indisputably renders that asset an integral part of the taxpayer's regular business operations."  Texaco-Cities, 182 Ill. 2d at 272, 695 N.E.2d at 486.

In <u>Texaco-Cities</u>, 182 Ill. 2d at 265, 695 N.E.2d at 483, the taxpayer, a Delaware corporation with its principal offices in Texas, was in the business of transporting crude oil and other petroleum products by pipelines, some of which ran through Illinois.  During the 1983 tax year, the taxpayer sold major segments of its pipeline assets, including its entire contingent of pipeline assets in Illinois.  <u>Texaco-Cities</u>, 182 Ill. 2d at 265, 695 N.E.2d at 483.  The taxpayer realized a gain of $9,987,176 and reported the income from its sale as nonbusiness income on its tax return for 1983.  <u>Texaco-Cities</u>, 182 Ill. 2d at 265, 695 N.E.2d at 483.  The Department conducted an audit and reclassified the gain as business income subject to apportionment, finding the sale constituted an integral part of the taxpayer's business operations.  <u>Texaco-Cities</u>, 182 Ill. 2d at 265-66, 695 N.E.2d at 483.  The taxpayer filed a protest, but ultimately, the Department's characterization of the gain as business income was upheld by the trial and appellate courts.  <u>Texaco-Cities</u>, 182 Ill. 2d at 266-67, 695 N.E.2d at 483-84.

The supreme court found the functional test contained in "section 1501(a)(1) focuses upon the role or function of the property as being integral to regular business operations."  <u>Texaco-Cities</u>, 182 Ill. 2d at 272, 695 N.E.2d at 486.  Thus, the taxpayer's use of a capital asset in its regular trade or business "indisputably renders that asset an integral part of the taxpayer's regular business operations."  <u>Texaco-Cities</u>, 182 Ill. 2d at 272, 695 N.E.2d at 486.

The supreme court noted Texaco-Cities was in the business of pipeline transportation, the pipelines sold were used to transport petroleum in the regular course of business, and thus the pipelines were used for the production of income. Texaco-Cities, 182 Ill. 2d at 273, 695 N.E.2d at 486. Applying a functional test, the court held the gain represented apportionable business income under the Income Tax Act. Texaco-Cities, 182 Ill. 2d at 274, 695 N.E.2d at 487.

The supreme court then examined and distinguished the Pennsylvania Supreme Court's decision in Laurel Pipe Line Co. v. Commonwealth of Pennsylvania Board of Finance & Revenue, 537 Pa. 205, 642 A.2d 472 (1994). There, the proceeds from the sale of an independent pipeline by a company in the business of transporting petroleum were determined to be nonbusiness income. The court in Laurel Pipe Line found the sale a liquidation of a separate and distinct aspect of the taxpayer's business, that being all of its pipeline operations in a specific region, and thus it could be "characterized as a partial liquidation which has changed the structure of the taxpayer's business." Laurel Pipe Line, 537 Pa. at 214, 642 A.2d at 477, citing McVean & Barlow, Inc. v. New Mexico Bureau of Revenue, 88 N.M. 521, 543 P.2d 489 (1975).

In distinguishing Texaco-Cities from Laurel Pipe Line, the Illinois Supreme Court found the sale by Texaco-Cities did not represent a liquidation and cessation of its business operations or a separate and distinct portion thereof. Texaco-Cities,

- 11 -

182 Ill. 2d at 273, 695 N.E.2d at 486-87.  Further, the court found "the sales proceeds were invested right back into that business rather than being disseminated to its shareholders." Texaco-Cities, 182 Ill. 2d at 273, 695 N.E.2d at 486-87.  The court concluded the gain from the sale was properly classified as business income.  Texaco-Cities, 182 Ill. 2d at 274, 695 N.E.2d at 487.

Following the decisions in Texaco-Cities and Laurel Pipe Line, courts have recognized a business-liquidation exception to the functional test.  See Blessing/White, 329 Ill. App. 3d at 726, 768 N.E.2d at 341 (Texaco-Cities "tacitly recognizes the distinctive nature of corporate liquidations resulting in a discontinuation of business activity"); American States, 352 Ill. App. 3d at 530, 816 N.E.2d at 666 (reaffirming Blessing/White); Shakkour v. Hamer, No. 1-04-1646, slip op. at 9 (November 9, 2006), ___ Ill. App. 3d ___, ___, ___ N.E.2d ___, ___ (wherein the Department acknowledged the business-liquidation exception set forth in Blessing/White).

In Blessing/White, 329 Ill. App. 3d at 717, 768 N.E.2d at 335, Blessing/White, Inc., a New Jersey corporation, was engaged in human-resource consultation with a sales office in Chicago.  In 1989, Blessing/White sold substantially all of its assets that had been used in the regular course of business and as part of its income-producing activities in Illinois.  There-after, Blessing/White ceased its business activities and distrib-uted nearly all of the sale proceeds to Blessing and White.

- 12 -

Blessing/White, 329 Ill. App. 3d at 717, 768 N.E.2d at 335. After an audit, the Department reclassified the gain as business income apportionable to Illinois and assessed a tax deficiency. Blessing/White, 329 Ill. App. 3d at 717, 768 N.E.2d at 335.

In examining the Texaco-Cities case, the First District noted the supreme court determined "the functional test for business income is satisfied where the asset disposed of was used by the taxpayer as an integral part of its regular trade or business operations." Blessing/White, 329 Ill. App. 3d at 723, 768 N.E.2d at 339. However, the First District found the supreme court's opinion allowed the use of a modified form of the functional test "when the disposition of assets was made pursuant to a corporate liquidation in cessation of business." Blessing/White, 329 Ill. App. 3d at 724, 768 N.E.2d at 340.

In the case before it, the First District found the disposition of assets amounted to a liquidation of Blessing/White's business property, "reflecting an extraordinary, one-time corporate event and marking the cessation of the company's business activities, including those conducted in Illinois." Blessing/White, 329 Ill. App. 3d at 728, 768 N.E.2d at 343. Further, the proceeds were not used to support an ongoing business concern but were disbursed in their entirety to the shareholders. Blessing/White, 329 Ill. App. 3d at 728, 768 N.E.2d at 343. Thus, as the liquidation of assets was not integral to the company's regular business operations, the gain did not constitute business income under the functional approach.

Blessing/White, 329 Ill. App. 3d at 728, 768 N.E.2d at 343.

In American States, 352 Ill. App. 3d at 531, 816 N.E.2d at 667, the First District interpreted Texaco-Cities to stand for the proposition that without "evidence that the sale was a cessation of a separate and distinct portion of Texaco-Cities' business," a gain would be properly classified as business income. The First District found the transaction at issue "involved the cessation of a separate and distinct portion of the business of the former shareholders of American States" and concluded the gain constituted nonbusiness income. American States, 352 Ill. App. 3d at 532, 816 N.E.2d at 668.

In the First District's recent opinion in Shakkour, slip op. at 2, ___ Ill. App. 3d at ___, ___ N.E.2d at ___, the taxpayer, a nonresident of Illinois, was a general partner of O'Connor Partners, an Illinois partnership. O'Connor Partners was owned in part by O'Connor & Associates, also an Illinois partnership, which developed intellectual property known as the "Trading Technology." Shakkour, slip op. at 2, ___ Ill. App. 3d at ___, ___ N.E.2d at ___. O'Connor Partners and Swiss Bank organized a limited partnership known as SBC/OC Services, L.P. Later, O'Connor & Associates contributed the Trading Technology to O'Connor Partners as a capital contribution. Shakkour, slip op. at 3, ___ Ill. App. 3d at ___, ___ N.E.2d at ___. In 1992, O'Connor Partners sold its general partnership interest in SBC/OC Services and the Trading Technology to Swiss Bank. The Trading Technology was sold for fixed and contingent payments, and Swiss

- 14 -

Bank took over use of it from O'Connor Partners.

The taxpayer did not report her distributive share of O'Connor Partners' income received from the sale of the Trading Technology as business income on her Illinois income-tax return but did report it on her New York and Connecticut returns. Shakkour, slip op. at 4, ___ Ill. App. 3d at ___, ___ N.E.2d at ___. The Department issued a notice of deficiency, and Shakkour paid under protest. The trial court found the sale of the Trading Technology was an extraordinary event marking the cessation of O'Connor Partners' business activities and the sale proceeds were distributed to the partners. Shakkour, slip op. at 5, ___ Ill. App. 3d at ___, ___ N.E.2d at ___. The court found the sale fell within the business-liquidation exception to the functional test and Shakkour's share was not allocable to Illinois.

On appeal, the First District examined the holdings in the like cases of Blessing/White and American States. Shakkour, slip op. at 7-8, ___ Ill. App. 3d at ___, ___ N.E.2d at ___. In noting Blessing/White's focus on the modified form of the functional test, the court found O'Connor Partners disposed of the Trading Technology asset, the disposition marked the cessation of business operations, and the proceeds were not reinvested in operations but were distributed to shareholders. Shakkour, slip op. at 11, ___ Ill. App. 3d at ___, ___ N.E.2d at ___. The court concluded "the sale was an extraordinary event that was a marked departure from its previous business of licensing the Trading

- 15 -

Technology," and the income should be classified as nonbusiness income. Shakkour, slip op. at 14, ___ Ill. App. 3d at ___, ___ N.E.2d at ___.

In this case, defendants contend the First District's decisions in Blessing/White and American States should not be followed because Texaco-Cities did not recognize the business-liquidation exception. We disagree.

In Texaco-Cities, the supreme court found the functional test for business income is focused on whether the asset disposed of was used by the taxpayer as an integral part of its regular business operations. Texaco-Cities, 182 Ill. 2d at 272, 695 N.E.2d at 486. However, a complete reading of the opinion indicates a modified form of the functional test is appropriate if the disposition of assets was made pursuant to a corporate liquidation in cessation of the business.

The supreme court's discussion and ultimate distinguishment of Laurel Pipe Line to the facts before it is quite telling. In Laurel Pipe Line, the Pennsylvania Supreme Court considered the totality of circumstances surrounding the sale and noted the sales proceeds had been distributed to shareholders rather than being used to acquire assets or income for use in future business operations. See Texaco-Cities, 182 Ill. 2d at 273, 695 N.E.2d at 486, citing Laurel Pipe Line, 537 Pa. at 213-14, 642 A.2d at 476-77. In contrast, the Illinois Supreme Court found Texaco-Cities remained in the pipeline-transportation business and the sales proceeds were invested back into the

business rather than being disbursed to shareholders. <u>Texaco-Cities</u>, 182 Ill. 2d at 273, 695 N.E.2d at 486-87. Further, and contrary to cases relied on by Texaco-Cities, the court found the evidence before it did not indicate the sale amounted to a cessation of a separate and distinct portion of Texaco-Cities' business. <u>Texaco-Cities</u>, 182 Ill. 2d at 274, 695 N.E.2d at 487. Thus, the court implied that, <u>had</u> <u>there</u> <u>been</u> <u>evidence</u> that the sale was a cessation of business operations, the result of the case would have been different and quite likely in line with <u>Laurel Pipe Line</u>. See <u>American States</u>, 352 Ill. App. 3d at 530, 816 N.E.2d at 666 (the Department was unable to answer why the supreme court distinguished <u>Laurel Pipe Line</u> rather than simply rejecting it as unpersuasive); <u>Blessing/White</u>, 329 Ill. App. 3d at 725, 768 N.E.2d at 341 (supreme court's treatment of the decision in <u>Laurel Pipe Line</u> "suggests the functional test assumes a different application in cases where the taxpayer's disposition of assets amounts to a corporate liquidation in cessation of business").

The interpretation of the supreme court's plain language is unmistakable, and any arguments by defendants as to the continued validity of the business-liquidation exception, considering the change in the statute and the case law of foreign jurisdictions, are better directed to the supreme court. See <u>Robbins v. Allstate Insurance Co.</u>, 362 Ill. App. 3d 540, 545, 841 N.E.2d 22, 27 (2005). As we find the First District's authority on this matter persuasive, we agree a gain from the liquidation

- 17 -

and cessation of business operations--or a distinct and separate portion thereof--constitutes nonbusiness income under the business-liquidation exception to the functional test.

### C. Business-Liquidation Income

Defendants argue that even if the business-liquidation exception to the functional test for business income was valid, it would not apply here because the proceeds were reinvested in Loblaw's ongoing business.  National Holdings argues the sale of National Tea's and Super Market's assets were in liquidation of their retail grocery business.

In deciding whether the gain from the sale of property was business or nonbusiness income, the First District looks at whether (1) the sale was in liquidation of the taxpayer's business and (2) the proceeds were disbursed to the shareholders. Shakkour, slip op. at 10, ___ Ill. App. 3d at ___, ___ N.E.2d at ___; American States, 352 Ill. App. 3d at 531-32, 816 N.E.2d at 667-68; Blessing/White, 329 Ill. App. 3d at 728, 768 N.E.2d at 343.  We adopt and apply the First District's approach to our facts here.

In June 1995, National Tea and Super Markets entered into an asset-purchase agreement with Schnuck Markets and thereafter ceased to operate their retail grocery business.  Super Markets distributed all of its assets to National Tea.  National Tea's board of directors passed a resolution in which the liquidating sale proceeds were declared as a dividend and paid to National Holdings.  National Holdings owned 100% of the capital

- 18 -

stock of Super Markets and National Tea.  In November 1995, National Holdings contributed the proceeds to Glendel as its only asset.  The proceeds were invested in interest-bearing debt securities and were never used in conducting a business in the United States.  In June 2000, Glendel and National Holdings were liquidated, and the proceeds were contributed to Glen Huron Bank, organized and domiciled in Barbados.  Accordingly, we find the proceeds of the liquidation were not reinvested in the ongoing retail grocery business of the taxpayer, and the trial court correctly applied the liquidation exception to the functional test.

III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT and COOK, JJ., concur.