HERCULES, INCORPORATED, Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (1st Division)    No. 1—00—0433

Opinion filed June 29, 2001.—Rehearing denied July 30, 2001.

Fred M. Ackerson, of Foley & Lardner, of Chicago, and Paul H. Frankel, admitted *pro hac vice*, of Morrison & Foerster, New York, New York, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Brian F. Barov, Assistant Attorney General, of counsel), for appellees.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:
Plaintiff, Hercules, Inc., appeals the order of the circuit court affirming the Department of Revenue's (Department) finding that

plaintiff owes taxes on a $1.3 billion capital gain it earned in 1987. On April 1, 1999, the circuit court entered a judgment against Hercules for $950,472 in tax, $630,200 in penalties and $921,161 in interest through March 1, 1999.

In 1991, the Department issued to plaintiff a notice of business income tax deficiency. The Department determined that Hercules' capital gain from the sale of stock in Himont, a publically traded corporation, constituted business income apportionable to Illinois. Plaintiff filed a protest and received a hearing before an administrative law judge (ALJ). The ALJ recommended that the Department sustain the notice of tax deficiency, concluding that all the capital gains from the sale of the stock constituted apportionable business income. The Director of the Department adopted the ALJ's decision. Plaintiff then sought administrative review, and the circuit court affirmed the Department's decision. Plaintiff moved for reconsideration and the circuit court granted the motion and vacated its prior decision and order. However, the circuit court again affirmed the Department's decision "based upon different applications of the law to the facts from those espoused by the administrative law judge."

On appeal, plaintiff raises three issues for review: (1) that the imposition of the Illinois income tax on its capital gain from the sale of the Himont stock violates the due process clause and the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, amend. XIV); (2) that the capital gain did not constitute business income under section 1501(a)(1) of the Illinois Income Tax Act (35 ILCS 5/1501(a)(1) (West 1998)); and (3) that, if the court sustains the Department's decision, plaintiff is entitled to an abatement of penalties because it possessed a reasonable cause for its tax position. We reverse.

At the administrative hearing, the parties entered an extensive stipulation of facts which included 25 exhibits. Plaintiff also called three witnesses. We would defer to any findings of fact in this case, but for the most part the parties agree that the facts are undisputed. *Chicago Patrolmen's Ass'n v. Department of Revenue*, 171 Ill. 2d 263, 271 (1996). The dispute in this case concerns the legal conclusions to be drawn from the facts.

## I. BACKGROUND

In 1983, Hercules was a chemical manufacturing and aerospace company that operated throughout the United States and in foreign countries. Hercules was incorporated in Delaware, and its principal place of business was located in Wilmington, Delaware. Hercules additionally maintained a sales office in Illinois, where its main business

activity was the sale of industrial chemicals. Occasionally, plaintiff stored inventory at a public warehouse in Chicago. Plaintiff did not own or operate any manufacturing facilities within the State of Illinois.

Prior to November 1, 1983, Hercules was a global manufacturer of a petroleum-based plastic called polypropylene. Between 1981 and November 1, 1983, Hercules sold over $1 billion worth of polypropylene, and this amount consisted of 15% of plaintiff's net sales. Hercules, however, did not maintain the technology to economically produce polypropylene and, with the increase of oil costs, plaintiff decided to reduce its reliance on this product. On November 1, 1983, plaintiff and an Italian corporation, Montedison, entered into a joint-venture agreement. The agreement created the corporation, Himont, which would take over all aspects of the manufacture and sale of polypropylene. Himont was a Delaware corporation with its principal place of business in Delaware. In exchange for 50% of the stock of Himont, plaintiff contributed all of its assets involved in the sale and manufacturing of polypropylene to Himont. Specifically, Hercules transferred to Himont its six manufacturing plants; all of its patents, copyrights, trademarks, and other technical information; its inventory, including finished products and raw materials; and its accounts receivable. In addition, all of Hercules' employees involved in the manufacturing of polypropylene resigned their positions with Hercules and took positions with Himont. Hercules did not rehire any of these employees. After the transfer of assets by Hercules to Himont on November 1, 1983, Hercules had no facilities, personnel or technology engaged in the sale, marketing or manufacturing of polypropylene.

Montedison also received 50% of the stock in Himont. For this stock, Montedison gave Himont its manufacturing business in polypropylene and a new technology for the manufacturing process. This new technology used an advanced catalyst that reduced the costs for production and provided a higher yield. Himont's "prime directive" was to implement this new technology through the construction of new plants. The joint-venture agreement also directed Montedison to make payments to Himont totaling $180,000 so that its investment in Himont would be equal to that of Hercules. Moreover, Hercules and Montedison agreed not to sell their stock in Himont for five years unless they both consented to the transfer. The joint-venture agreement contained rights of first refusal, restrictions on pledges of stock, provision for future financial requirement and termination rights. As a result of the joint-venture agreement, Hercules no longer produced or sold polypropylene.

Initially, both Hercules and Montedison appointed three directors

to Himont's six-member board of directors. Hercules also selected Himont's president, three out of six vice-presidents, chief financial officer, and controller. At no time did Hercules and Himont have any common officers or employees. Further, none of Hercules' employees were involved in the day-to-day operations of Himont. When Himont's stock went public in February 1987, its board of directors was expanded to 11 members. Hercules still retained the right to elect three members to the board of directors.

Between 1983 and 1987, Hercules provided Himont with a variety of services, such as advertising, public relations, comptroller, engineering, medical, legal, tax and audit, billing, purchasing, and information technology. Himont paid Hercules approximately $9.9 million per year for these services. An independent accounting firm reviewed these transactions and determined that the amount Himont paid for these services was comparable to the amounts charged by unrelated companies. Hercules additionally purchased polypropylene from Himont. Hercules agreed to purchase 80% to 85% of its polypropylene between 1983 and 1987 and negotiated a 2.5% discount on its purchases. Hercules also continued to purchase polypropylene from other suppliers.

On February 12, 1987, Himont offered 22.6% of its common stock to the public in its initial public offering. Following this public offering, Hercules' and Montedison's ownership shares of Himont fell to 38.7% each. In September 1987, Montedison threatened to take over Hercules if it did not sell its remaining shares in Himont. Montedison also agreed to pay a premium for the stock owned by Hercules. Hercules then agreed to sell its shares, and in 1987 Montedison paid Hercules $1,487,500,000, or $59.50 per share, resulting in a net capital gain to Hercules of $1,338,501,966.

Hercules reported its capital gain from the sale of the Himont stock to Montedison as nonbusiness income on its 1987 Illinois income tax return. After auditing Hercules and determining that this capital gain constituted business income, the Department issued a notice of deficiency for $950,472 in taxes and $213,026 in penalties for the 1987 tax year. Hercules filed a protest and received a hearing before an ALJ. The ALJ recommended the Department sustain the notice of tax deficiency. The ALJ first found that the capital gain income constituted business income under section 1501(a)(1) of the Illinois Income Tax Act. The ALJ noted that courts apply either a transactional or functional test in applying section 1501(a)(1). The ALJ found that the transactional test was satisfied because the formation of Himont did not terminate Hercules' role in the manufacture of polypropylene and Hercules maintained an operational connection with Himont. The

ALJ found the gain was income under the transactional test because creating and selling joint ventures was a regular practice of Hercules.

The ALJ also found that the capital gain constituted business income under the functional test because Himont was an asset used in Hercules' regular trade or business. The ALJ reasoned that the income that Hercules received was not just a result of a sale of stock but of the transfer of its entire polypropylene operation to Himont. The ALJ next found a unitary business relationship between Hercules and Himont's manufacture and sale of polypropylene. The ALJ thus believed that because Hercules and Himont were functionally integrated, the companies had an adequate nexus with Illinois to allow Illinois to tax Hercules' income from the sale of the stock. The Department adopted the decision of the ALJ.

Hercules filed a petition for administrative review in the circuit court. The circuit court confirmed the Department's decision. The court first agreed with the ALJ that a unitary business relationship existed between Hercules and Himont. The circuit court found that the gain from the sale of Himont stock was business income under the functional test because the stock was an integral part of Hercules' regular trade or business operations. The court ordered Hercules to pay $950,472 in tax, $630,200 in penalty, and $921,161 in interest.

Hercules filed a motion for reconsideration. The circuit court granted the motion and vacated its prior decision and order. On January 5, 2000, the circuit court issued a memorandum decision and order. The circuit court noted that it still affirmed the decision entered by the Department; however, it reached its decision "based on different applications of the law to the facts from those espoused by the Administrative Law Judge."

The circuit court reversed its conclusion reached in the previous order and found no unitary business relationship because there was no evidence of any functional integration, management control or economies of scale between Hercules and Himont. In the previous order the circuit court had found the capital gain was apportionable under the unitary business theory and noted "there were sufficient indicia of functional integration, centralized management and economies of scale."

The circuit court also disagreed with the finding by the ALJ that the transactional test was met because "[t]here is no evidence Hercules was in the business of forming and divesting itself of joint ventures." The circuit court further stated: "While the Court does not find the transactional test is met it does find the functional test is met." The circuit court indicated that the functional test for business income was met because Himont was not merely a passive investment

of Hercules, but was an asset used in its regular trade and business, and the gain was used for operational functions.

The circuit court also concluded that the commerce clause and due process clause did not prevent Illinois from taxing the Hercules gain, based on its finding that "there was an operational function between Hercules and Himont when it surrendered its stock to allow for an initial public offering," which "was a means of supplying financial support to Himont." Hercules then filed this appeal.

●1 Under the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1998)), we review the final decision of the administrative agency and not the decision of the circuit court. *Richard's Tire Co. v. Zehnder*, 295 Ill. App. 3d 48, 56 (1998). While the reviewing court defers to the agency's findings of fact (735 ILCS 5/3—110 (West 1998)), it conducts an independent review of its conclusions of law. *County of Cook v. Licensed Practical Nurses Ass'n of Illinois, Division I*, 284 Ill. App. 3d 145, 152 (1996). When the agency decides a mixed question of law and fact, we review its decision under a clearly erroneous standard. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191 (1998). We review the agency's decision *de novo* when the issue on appeal is a question of law and involves no factual dispute. *Rockwood Holding Co. v. Department of Revenue*, 312 Ill. App. 3d 1120, 1123 (2000).

## II. CONSTITUTIONALITY OF APPORTIONING STOCK SALE INCOME

●2 Plaintiff's first argument challenges the constitutionality of apportioning the income gained from the sale of the Himont stock. This constitutional challenge presents a question of law. Questions of law decided by an agency are not entitled to deference and are reviewed *de novo. Hartmarx Corp. v. Bower*, 309 Ill. App. 3d 959, 964 (1999). Therefore, we review *de novo* the issue of whether the due process clause and commerce clause of the United States Constitution prohibit the Department from apportioning Hercules' gain from the sale of the Himont stock. The Department acknowledges that the facts are "largely undisputed."

●3 The United States Constitution requires that the taxpayer have "some minimum connection" with the taxing body and that the tax be "rationally related to 'values connected with the taxing [s]tate.' " *Quill Corp. v. North Dakota*, 504 U.S. 298, 306, 119 L. Ed. 2d 91, 102, 112 S. Ct. 1904, 1909-10 (1992), quoting *Moorman Manufacturing Co. v. Bair*, 437 U.S. 267, 273, 57 L. Ed. 2d 197, 204, 98 S. Ct. 2340, 2344 (1978). Thus, a state may not tax value outside its borders. *Allied-Signal, Inc. v. Director, Division of Taxation*, 504 U.S. 768, 119 L. Ed.

2d 533, 112 S. Ct. 2251 (1992). The due process and commerce clauses of the United States Constitution require " 'some definite link, some minimum connection, between a state and the *** transaction it seeks to tax.' " *Quill Corp.*, 504 U.S. at 306, 119 L. Ed. 2d at 102, 112 S. Ct. at 1909, quoting *Miller Brothers Co. v. Maryland*, 347 U.S. 340, 344-45, 98 L. Ed. 744, 748, 74 S. Ct. 535, 539 (1954). A state may, however, tax the multistate income of a nondomiciliary corporation if a minimal connection exists between the corporation's business activities and the taxing state and a rational relationship exists between "the income attributed to the taxing State and the intrastate value of the corporate business." *Allied-Signal, Inc.*, 504 U.S. at 772, 119 L. Ed. 2d at 542, 112 S. Ct. at 2255. "[T]he taxpayer has the distinct burden of showing by clear and cogent evidence that [the state tax] results" in the taxation of "extraterritorial values." *Container Corp. v. Franchise Tax Board*, 463 U.S. 159, 164, 77 L. Ed. 2d 545, 552, 103 S. Ct. 2933, 2939-40 (1983).

●4 The United State Supreme Court has adopted two tests to determine whether a state may apportion income of a nondomiciliary corporation: the "unitary business relationship" and "operational function" tests. In the case of income from an intangible asset, these two tests are satisfied by showing either that the taxpayer and the corporation that was the source of the income have a unitary business relationship, or that the intangible asset served "an operational rather than an investment function." *Allied-Signal, Inc.*, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263.

## A. UNITARY RELATIONSHIP TEST

●5 The United States Supreme Court has indicated that a unitary business relationship requires demonstration of a "flow of value," including "some sharing or exchange of value not capable of precise identification or measurement—beyond the mere flow of funds arising out of a passive investment or a distinct business operation." *Container Corp.*, 463 U.S. at 166, 77 L. Ed. 2d at 554, 103 S. Ct. at 2940. Under the unitary business relationship test, the payee and the payor of the dividend or other income have a unitary business relationship.

More specifically, although a business may have subsidiaries, divisions, or common ownership of other businesses that operate in different jurisdictions, a single state may tax all the income earned and apportioned it because the businesses have common managerial or operational resources that produce economies of scale and a substantial sharing of values. *Container Corp.*, 463 U.S. at 179, 77 L. Ed. 2d at 562, 103 S. Ct. at 2947-48. The Court has stated that " '[t]he linchpin of apportionability in the field of state income taxation is the unitary-

business principle.' " (Emphasis omitted.) *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 317, 73 L. Ed. 2d 787, 795, 102 S. Ct. 3103, 3109 (1982), quoting *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 439-40, 63 L. Ed. 2d 510, 522, 100 S. Ct. 1223, 1232-33 (1980). The three-prong test for finding a unitary business relationship as recognized in *Allied-Signal, Inc.* is functional integration, centralization of management, and economies of scale. *Allied-Signal, Inc.*, 504 U.S. at 781, 119 L. Ed. 2d at 549, 112 S. Ct. at 2260.

●6 Here, the Department acknowledges that here the unitary relationship test is not satisfied because the payor of the gain, Montedison, and the payee, Hercules, have no unitary business relationship. Montedison and Hercules were separate corporations that entered into a joint-venture agreement. In addition, the Department concedes that under Illinois law no unitary business relationship existed between Hercules and Himont because Hercules did not own or control more than 50% of Himont's stock. Illinois law requires that in order for a subsidiary to be a member of a unitary business group with its parent, the parent corporation must control or own more than 50% of the stock of the subsidiary. 35 ILCS 5/1501(a)(27) (West 1998). In 1987 Hercules did not own or control more than 50% of Himont's stock.

We note that the conclusion reached by the ALJ finding a unitary business relationship between Hercules and Himont was error. We further note the circuit court in its original order found that the requirements of the unitary business relationship were met, but reversed that conclusion in its final order, finding no unitary business relationship. The Department indicates it does not seek to apportion the gain from the sale of the stock by Hercules on the basis that Hercules and Himont were members of a unitary business group. Therefore, we must examine whether the apportionment of the capital gain income satisfies the operational function test.

## B. OPERATIONAL FUNCTION TEST

●7 Under the operational function test, a state may apportion income even though no unitary relationship exists between the payee and payor. *Allied-Signal, Inc.*, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263. The state has the authority to apportion the income when the capital transaction serves an operational rather than an investment function. *Allied-Signal, Inc.*, 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263. The relevant inquiry in determining whether a capital transaction involving an asset serves an investment or operational function "focuses on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State." *Allied-Signal, Inc.*, 504 U.S. at 785, 119 L. Ed. 2d at 550, 112 S. Ct. at 2262.

The Department argues that Hercules' investment in Himont served an operational not an investment function because Hercules contributed substantial assets, expertise, and services to Himont. The Department emphasizes that Hercules created Himont, supplied its workforce, and chose members of its board of directors and its president. The Department further claims that Hercules' ownership of Himont's stock constituted an integral part of Hercules' overall business and operations.

This argument is not supported by the record, which indicates that Himont was operated as a "stand alone" corporation, that Hercules never owned a majority of the stock in Himont, and that Hercules started this independent corporation close to four years before it sold its minority stock interest. Hercules did not exercise management control over Himont. At no time did Hercules have the right to elect a majority of Himont's directors. In September 1987 when the stock was sold, Hercules elected only 3 of 11 directors, while previously Himont's board of directors was composed of three directors appointed by Hercules and three appointed by Montedison. Himont and Hercules had no common officers or employees during any period after Himont was created on November 1, 1983. Hercules and Montedison designed their 50-50 ownership of Himont so that neither Hercules nor Montedison could control Himont. Moreover, Hercules was not involved in the managing or upgrading of Himont's facilities, which was the major business objective of Himont from 1983 to 1987. Hercules had no control over Himont's officers or board of directors and there was no centralized management or transfers of personnel between Hercules and Himont. Himont management established policies completely independent from Hercules. Himont was designed to operate its polypropylene manufacturing and marketing business as an independent, stand-alone company. Hercules formed Himont to divest itself from an operational relationship to the polypropylene business. We therefore reject the Department's argument that Hercules' investment served an operational function because Hercules created Himont, supplied its workforce and chose members of its board of directors.

Between 1983 and 1987, Hercules provided Himont with a variety of services, such as advertising, public relations, comptroller, engineering, medical, legal, tax and audit, billing, purchasing, and information technology. Himont paid Hercules approximately $9.9 million per year for these services. An independent accounting firm reviewed these transactions and determined that the amount Himont paid for these services was comparable to the amounts charged by unrelated companies. Based on the record, we therefore reject the Department's argument that the contribution of substantial assets to Himont from Hercules demonstrated an operational relationship.

Himont's sales of polypropylene to Hercules were at open market prices, less negotiated volume discounts, which the independent accounting firm of Coopers & Lybrand described as "market pricing mechanisms less appropriate discounts to reflect the savings of marketing costs." The parties stipulated that Hercules purchased polypropylene from other major producers, including Exxon, Fina, Phillips Petroleum, Shell Oil and Union Carbide. Hercules' status as a customer of Himont did not create an integration of the two business operations. In 1983 Hercules divested its polypropylene business by creating Himont with Montedison. None of the funds received by Hercules as the result of its sale in 1987 of its 38.7% stock interest in Himont were reinvested in the polypropylene business. The record indicates that when Hercules sold its stock to Himont in 1987 Hercules had been completely removed from the sale and manufacturing of polypropylene. The record does not support the conclusion that an integral, operational relationship existed between Hercules and Himont. We therefore reject the Department's contention that Himont was part of Hercules' overall business of chemical and product manufacturing.

Here, the Department's operational argument additionally relies on the incorrect premise that it can levy a tax because Hercules' purpose was to generate income from its investment in Himont and its stock ownership in Himont was an integral part of Hercules' overall business and operations. In addressing that argument we find the case of *ASARCO, Inc.* instructive. In *ASARCO, Inc.*, the Supreme Court found that Idaho could not tax ASARCO's income from its ownership of stock in Southern Peru. ASARCO was a global corporation involved in mining, smelting, and refining nonferrous metals. ASARCO mined metals, such as silver, in Idaho and operated an administrative office in Idaho. ASARCO additionally owned 51.5% of stock in Southern Peru, which mined and smelted copper in Peru. ASARCO purchased 35% of the metals that Southern Peru sold at arm's-length prices. ASARCO also provided administrative services for Southern Peru for a fee and appointed 6 out of 13 members of Southern Peru's board of directors. After reviewing these facts, the Supreme Court found that "ASARCO's Idaho silver mining and Southern Peru's autonomous business are insufficiently connected to permit the two companies to be classified as a unitary business." *ASARCO*, 458 U.S. at 322, 73 L. Ed. 2d at 799, 102 S. Ct. at 3112.

Idaho also asserted that its tax was permissible because ASARCO's ownership of the stock either was related to or in furtherance of its business or trade. The Supreme Court rejected this argument that corporate purpose should define unitary business. The Court

stated, "[t]he business of a corporation requires that it earn money to continue operations and to provide a return on its invested capital. Consequently all of its operations, including any investment made, in some sense can be said to be 'for purposes related to or contributing to the [corporation's] business.' " (Emphasis omitted.) *ASARCO*, 458 U.S. at 326, 73 L. Ed. 2d at 801, 102 S. Ct. at 3114; see also *Allied-Signal*, 504 U.S. at 788, 119 L. Ed. 2d at 553, 112 S. Ct. at 2263-64 ("the mere fact that an intangible asset was acquired pursuant to a long-term corporate strategy of acquisitions and dispositions does not convert an otherwise passive investment into an integral operational one").

We reject the Department's argument that there was a significant flow of value between Hercules and Himont, well beyond what the facts showed in *ASARCO*. Here, we note that ASARCO owned 51.5% of its affiliate Southern Peru, while Hercules owned 38.7% of Himont. Hercules purchased about 12% of Himont's polypropylene output, and ASARCO purchased 35% of Southern Peru's copper production. As required by *Allied-Signal, Inc.*, we are mindful that, in determining whether an asset serves an investment or operational function, we "focus on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State." *Allied-Signal, Inc.*, 504 U.S. at 785, 119 L. Ed. 2d at 550, 112 S. Ct. at 2262.

Based on the record we find no significant distinction between ASARCO's investment in Southern Peru and Hercules' investment in Himont. Both Hercules and ASARCO provided some administrative services for a fee to their subsidiary. Both Himont and Southern Peru were managed independently. In both cases there were substantial intercompany sales, but the sales were made at market prices and could have been obtained from other sources. The holding in ASARCO was based on the finding that Southern Peru and the other ASARCO subsidiaries were discrete business enterprises which were not involved with the business activities of ASARCO in Idaho. The record supports a similar conclusion in this case. In Illinois the business conducted by Hercules was limited to the sale of industrial chemicals, involving a regional sales office and a warehouse. Hercules divested its polypropylene business in 1983 by creating Himont. The investment that Hercules maintained in Himont after 1983 had no relationship to the business activities of Hercules in Illinois. Illinois had no more relationship with Hercules' gain on the Himont stock sale than Idaho had with ASARCO's dividends from Southern Peru.

We note the Attorney General discusses cases that interpret the business income definition from other jurisdictions, including Alaska, Colorado, New Mexico, Oregon and Pennsylvania. These cases do not

address the transaction at issue in this case, the sale of Himont stock by Hercules. However, the highest courts in Maryland and Minnesota have recently analyzed this transaction. Both courts found that this same transaction, the 1987 capital gain earned from the sale of Himont stock by Hercules, was not apportionable because it did not serve an operational function. Both courts concluded that the United States Constitution prohibits their states from taxing Hercules' income from its sale of the Himont stock. The Attorney General dismisses both cases as taking too narrow a view of the operational function test.

In *Hercules Inc. v. Commissioner of Revenue*, 575 N.W.2d 111 (Minn. 1998), the Minnesota Supreme Court found that an apportionment of the income from sale by Hercules of the Himont stock violated its statutory definition of business income and the due process clause of the United States Constitution. Relying on *Allied-Signal, Inc.*, the court gave two examples of how an asset may serve an operational function: first, a short-term investment, such as a bank account or certificate of deposit; second, a long-term investment "in commodity futures that ensures a certain supply of a necessary product at a fixed price." *Hercules Inc.*, 575 N.W.2d at 117, citing *Allied-Signal*, 504 U.S. at 789-90, 119 L. Ed. 2d at 553-54, 112 S. Ct at 2264. The court found no evidence that Hercules used its investment in Himont as a "repository for working capital like a bank account or certificate of deposit." *Hercules Inc.*, 575 N.W.2d at 117.

The court also examined whether Hercules' investment ensured a steady supply of polypropylene at a fixed price from Himont and concluded that it did not. Although in 1983 Hercules signed a supply agreement with Himont that stated that Hercules would purchase all of its polypropylene from Himont, the court found that this agreement gave Hercules no advantage in maintaining its supply of polypropylene. The court reasoned that polypropylene was widely available during the 1980s and Hercules purchased it from suppliers other than Himont. In addition, the court noted that "Hercules purchased polypropylene from Himont at an arm's length price, and continued to buy polypropylene from Himont at the same price even after it sold its stock." *Hercules Inc.*, 575 N.W.2d at 117. Therefore, the court determined that Hercules' purchase of polypropylene from Himont did not establish that its investment in Himont served an operational purpose. Finding no unitary relationship and no operational purpose served by Hercules' investment in Himont, the court concluded that apportionment of the Himont gain to Minnesota would violate the due process clause of the United States Constitution. *Hercules Inc.*, 575 N.W.2d at 117.

The Court of Appeals of Maryland reached the same conclusion. *Hercules Inc. v. Comptroller of the Treasury*, 351 Md. 101, 716 A.2d 276 (1998). The court of appeals agreed with the Minnesota Supreme Court that Hercules' investment in Himont could not be classified as a repository of working capital like a bank account or certificate of deposit. *Hercules Inc.*, 351 M.D. at 114, 716 A.2d at 282. The court next addressed whether "Himont served as a source of 'an essential product' for use in Hercules' unitary business." *Hercules Inc.*, 351 M.D. at 116, 716 A.2d at 282. The court noted that in *Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46, 100 L. Ed. 29, 76 S. Ct. 20 (1955), the Supreme Court found a taxpayer's investment in corn products constituted an integral part of its business. In that case, the taxpayer had suffered through periods of corn shortages and invested in corn futures to guard against future price swings. *Corn Products Refining Co.*, 350 U.S. at 48-49, 100 L. Ed. at 33-34, 76 S. Ct. at 22.

The Maryland Court of Appeals distinguished Hercules' investment in Himont from the taxpayer's speculative investment in *Corn Products Refining Co.* According to the court, polypropylene was widely available in the world, and Hercules could have purchased polypropylene under the same terms from any third-party supplier. *Hercules Inc.*, 351 Md. at 116, 716 A.2d at 283. There was no evidence that Hercules ever experienced a shortage of polypropylene. Moreover, the court pointed out that at the time that Hercules sold its Himont stock, Hercules increased its purchase of polypropylene and, following the sale, continued to purchase polypropylene at arm's-length prices. The court additionally rejected the argument that Hercules' supply of administrative services established an operational function to Hercules' ownership of the Himont stock. The court noted "[j]ust as HIMONT was not selling [polypropylene] to Hercules at a discount that was not available to other volume purchasers, HIMONT was not paying a premium to Hercules for the administrative services, and Hercules was not rendering the services at less than fair value." *Hercules Inc.*, 351 Md. at 118-19, 716 A.2d at 284. The court, therefore, concluded that Maryland could not apportion Hercules' gain from the sale of the Himont stock.

In criticizing these decisions, the Department relies on the analysis provided by Professors Hellerstein of the Minnesota and Maryland cases. 1 J. Hellerstein & W. Hellerstein, State Taxation: Constitutional Limitations and Corporate Income and Franchise Taxes 8—133 (3d ed. 1999). Professor Hellerstein believed that the Minnesota Supreme Court and the Maryland Court of Appeals took "too narrow a view of the 'operational function' concept." While Professor Hellerstein

recognized that the Supreme Court in *Allied-Signal, Inc.* gave only two examples of investments that serve an operational function, he suggested that those examples should not be exclusive. Professor Hellerstein, however, does not specifically explain how Hercules' investment in Himont served an operational function or under what constitutional standard a nondomiciliary state should be permitted to apportion this gain. Both the Minnesota Supreme Court and the Maryland Court of Appeals cited the two examples in *Allied-Signal, Inc.* as controlling.

## III. CONCLUSION

●8 In this case, we find that the due process clause and commerce clause of the United States Constitution prohibit Illinois from apportioning Hercules' capital gain. Hercules' ownership and sale in 1987 of its Himont stock did not serve an operational function. The Department does not suggest nor is there any evidence in the record that this investment provided a supply of working capital analogous to a bank account or certificate of deposit. The Department, however, relies on Hercules' authority to appoint officers and members of Himont's board of directors, the administrative services it provided Himont, and its purchase of polypropylene for purposes of demonstrating an operational function. As noted above, Hercules did not assert any management control over Himont. Hercules never owned a majority of stock in Himont, its officers did not oversee the day-to-day operations of Himont, and all of its employees that went to work for Himont permanently resigned their positions with Hercules. Himont employed its own officers and management board. From its inception, Himont existed as an independent, stand-alone corporation.

Moreover, the record establishes that while Himont received a variety of administrative services from Hercules, Himont paid the same price for these services that unrelated companies charged. Further, Hercules purchased polypropylene from Himont at market prices and could have purchased polypropylene from third parties at the same price. The Department, in fact, stipulated that during the time it owned Himont stock, Hercules purchased polypropylene from various third-party producers. Hercules divested its polypropylene business in 1983 by creating Himont, and Hercules' investment in Himont after 1983 had no relationship to Hercules' business in Illinois.

Based on the record and the totality of the circumstances, we find that Hercules has met its burden by demonstrating that its relationship with Himont served an investment, not an operational, function. Therefore, we conclude that Hercules' income from its sale of the Himont stock in 1987 did not serve an operational function. Apportion-

ment of this gain by Illinois would violate the commerce clause and due process clause of the United States Constitution.

In light of our ruling, we need not address the two other issues raised by Hercules.

For the foregoing reasons, we reverse the decisions of the circuit court of Cook County and the Department sustaining the notice of tax deficiency.

Reversed.

McNULTY, P.J., and COHEN, J., concur.