SIXTH DIVISION
January 12, 2007

No. 1-03-1160

| | | |
|---|---|---|
| THE MEAD CORPORATION, an Ohio Corporation, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 00 CH 7854 |
| THE DEPARTMENT OF REVENUE, GLEN L. BOWER, Director of the Department of Revenue, and JUDITH BAAR TOPINKA, Treasurer of the State of Illinois, | ) ) ) ) ) | Honorable Alexander P. White, Judge Presiding. |
| Defendants-Appellees. | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Plaintiff Mead Corporation, an Ohio corporation (Mead or plaintiff), appeals three orders of the circuit court concerning the classification and calculation of sales gain reported on its 1994 Illinois tax return, granting judgment in favor of defendants Illinois Department of Revenue (Department), Glen L. Bower, Director of the Illinois Department of Revenue,[1] and Judith Baar Topinka, Treasurer of the State of Illinois (collectively, defendants). Mead filed a combined unitary Illinois income tax return for the 1994 tax year, including Mead Data Central, Inc., Lexis, Inc., and Nexis, Inc. (collectively, Lexis/Nexis), as members of its unitary business group, and including in its Illinois combined apportionable business income the 1994 income earned by Lexis/Nexis, but excluding the gain of more than $1 billion from the sale of Lexis/Nexis that year. Mead also included its gross receipts from the sale of interest-bearing financial instruments

---

[1] Defendants note that the current Director, Brian Hamer, may be substituted for Bower, who is the former Director.

1-03-1160

in its sales factor denominator of the combined apportionment formula.  The Department determined that the Lexis/Nexis sale gain constituted apportionable business income and the net income, rather than the gross receipts from the sale of the financial instruments, should be used to compute Mead's sales factor denominator.  After the Department issued notices of deficiencies for more than $4 million in income tax and interest, which Mead paid under protest, Mead challenged the Department's classification of the sales gain as apportionable business income and its calculation of the sales factor denominator.  We affirm.

This case presents a voluminous record.  However, the facts, as set forth below, are essentially undisputed.

Mead is an Ohio corporation which transacts business in Illinois.  In 1968, when Mead was a producer and seller of paper, packaging, and school and office supplies, it purchased Data Corporation for $6 million.  At the time, Data Corporation was developing, among other things, ink jet printing technologies and a computerized full text information retrieval system.  The latter, by 1973, evolved into Lexis/Nexis.  Over the years, Mead made capital contributions to Lexis/Nexis, which become profitable only by the end of the 1970s.

During its ownership of Lexis/Nexis, Mead treated Lexis/Nexis variously as a corporate division or as a subsidiary.  In 1980, Lexis/Nexis was merged into Mead as a division; in 1985, Lexis/Nexis was reincorporated separately.  In December 1993, Mead and Lexis/Nexis merged again, with Lexis/Nexis again becoming a division of the parent company.  During the years of ownership, Mead continued to approve major capital expenditures for Lexis/Nexis, including a 1984 expansion of the Lexis/Nexis computer center and central processing units.  In 1993, at the

1-03-1160

time of the second merger, Mead's board of directors approved a capital expenditure of nearly $13 million for the improvement of Lexis/Nexis' search system. Again, the following year, the Mead board approved significant expenditures for Lexis/Nexis.

Mead and Lexis/Nexis maintained separate day-to-day business operations, and they did not share personnel or make joint purchases. Since 1980, Lexis/Nexis had its own building about 15 miles from Mead's Dayton headquarters. There was no centralized manufacturing or warehousing of products, and Mead and Lexis/Nexis were described as having different corporate cultures. There were no favorable intercompany transactions. However, Mead made nightly a cash sweep of Lexis/Nexis bank accounts, investing the funds with benefits accruing to Lexis/Nexis, but in a manner decided by Mead.

Since 1988, the Department had asserted that Mead and Lexis/Nexis were a unitary business. Although Mead disagreed, to settle disputed audit findings, Mead included Lexis/Nexis in its unitary business group from 1988 through 1994. According to Mead's 1993 annual report, Mead was not only "one of the world's largest manufacturers of paper," and a leader in packaging, but it was "the developer of the world's leading electronic information retrieval services for law, patents, accounting, finance, news and business information." Lexis/Nexis was included as one of Mead's business segments, but not in Mead's discussion of its "investees." Mead filed a 10-K form with the Securities and Exchange Commission (SEC) for the year ending December 31, 1993, in which Mead described itself as a company engaged in the manufacture and sale of paper and wood products, and school and office supplies, and engaged in electronic publishing.

1-03-1160

In May 1994, Mead announced its plan to sell Lexis/Nexis, stating in its press release that it had "grown" Lexis/Nexis "since 1968 from a small legal database into the world's premier provider of online legal information and the pioneer in computer-assisted news retrieval." On December 2, 1994, Mead sold the assets of Lexis/Nexis to Reed Elsevier, plc, for approximately $1.5 billion. In describing the divestiture in its 1994 annual report, Mead again stated that had "grow[n] this business" but decided to use approximately $350,000 of the gain to buy back stock. Mead also used the proceeds to reduce its short- and long-term debt levels.

For the 1994 tax year, Mead and its subsidiaries filed an Illinois combined unitary income tax return, in which it listed Lexis/Nexis as a unitary subsidiary, as it had done from 1988-93. Mead reported its base income as $1,074,709,139 and its Illinois sales in 1994 as $338,309,666, of which Lexis/Nexis contributed $46,912,518. Mead reported as nonbusiness income $1,056,001,948 in gain from the sale of its Lexis/Nexis division. The reported nonbusiness income was a gain on "goodwill" realized from the Lexis/Nexis sale. Mead also included Lexis/Nexis' assets in its Illinois apportionment factors on its 1994 Illinois return. Mead included in its computation of the denominator of the sales apportionment factor $4,846,382,229 as gross receipts from the sale of financial instruments, of which $1,967,953.61 was interest income earned by those investments.

The Department audited Mead's Illinois income tax returns for the 1993 and 1994 tax years and issued two notices of deficiencies for the 1994 tax year. The deficiency notices resulted from two audit findings: (1) the $1,056,001,948 gain from the Lexis/Nexis sale was improperly classified as nonbusiness income and (2) Mead could include only the $1,967,953.61

1-03-1160

that was interest income in its sales factor denominator rather than the $4,846,382,229 gross receipts from the sale of financial instruments. The Department found that Mead owed $3,149,222 in Illinois income tax and $1,049,017 in interest.

Mead protested, but paid the amount into the protest fund (see 30 ILCS 230/1 *et seq.* (West 2002)). In January 2001, Mead filed an amended verified complaint, seeking injunctive and declaratory relief. In the amended complaint, Mead challenged the Department's classification of the gain from the Lexis/Nexis sale as apportionable business income and the Department's calculation of its sales factor denominator.

In March 2002, proceedings on the former issue, which included the testimony of numerous witnesses, were held before the circuit court, while the latter issue was decided on the parties' cross-motions for partial summary judgment. As to the latter issue, the computation of the sales factor, the circuit court initially granted Mead's motion, and the Department filed a motion for reconsideration. On December 2, 2002, the court issued a memorandum decision, judgment and order, reversing the partial summary judgment in Mead's favor, denying Mead's motion for partial summary judgment, and granting the Department's motion for the same.

On March 18, 2003, the court issued a memorandum decision, judgment and order deciding the classification issue. In its order, the court found, among other things, that Mead and Lexis/Nexis were not unitary, the sale of Lexis/Nexis represented a liquidation in the business of electronic publishing, and, because the property disposed of in the liquidation was "essential to the taxpayer's regular trade or operations," the gain therefrom was apportionable business income.

1-03-1160

On March 25, 2003, the court issued a final judgment order, finding that all issues in plaintiff's first amended verified complaint had been resolved in favor of defendants (based on the findings of fact and conclusions of law set forth in the orders of December 2, 2002, and March 18, 2003) and that no remand to the Department was necessary. The court dissolved preliminary injunctions that had been entered in 1999 and 2001, ordered judgment to be entered in defendants' favor in the amount of $4, 238, 221, representing the 1999 and 2000 payments by plaintiff made under protest, ordered the State Treasurer to transfer the protest payments from the protest fund to the appropriate state fund, and stated that the order represented a complete disposition of all issues.

Mead appeals from the December 2, 2002, and March 18 and 25, 2003, orders.

On appeal, Mead first contends that the gain from the 1994 sale of Lexis/Nexis should be allocated rather than classified as apportionable Illinois income.

Initially, we note that the parties appear to agree on the standard of review. Both agree that the circuit court heard substantial testimony and considered documents and stipulated facts, but that, for the most part, the facts of this case were undisputed. The parties further recognize that, where the fact finder examines the legal effect of a given set of facts, it decides a mixed question of law and fact which is subject to an intermediate standard of review. See Carpetland U.S.A., Inc. v. Illinois Department of Employment Security, 201 Ill. 2d 351, 369, 776 N.E.2d 166 (2002); City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205, 692 N.E.2d 295 (1998). Under such circumstances, the decision is based on fact-finding that is inseparable from the application of law to fact and is reviewed under a clearly erroneous

1-03-1160

standard. Carpetland U.S.A., Inc., 201 Ill. 2d at 369; see AFM Messenger Service, Inc. v.

Department of Employment Security, 198 Ill. 2d 380, 391, 763 N.E.2d 272 (2001). This standard

is largely deferential to the decision maker. AFM Messenger Service, Inc., 198 Ill. 2d at 395;

Zebra Technologies Corp. v. Topinka, 344 Ill. App. 3d 474, 480, 799 N.E.2d 725 (2003).

Under the clearly erroneous standard, a finding of the lower court may be reversed only if,

after careful review of the entire record in light of the applicable rule of law, the reviewing court

is left with the "'definite and firm conviction'" that the finding is in error. Carpetland U.S.A.,

Inc., 201 Ill. 2d at 369, quoting AFM Messenger Service, Inc., 198 Ill. 2d at 395; Zebra

Technologies Corp., 344 Ill. App. 3d at 481. Purely factual findings are entitled to deference and

are reversed only if they are contrary to the manifest weight of the evidence (Carpetland U.S.A.,

Inc., 201 Ill. 2d at 369; Zebra Technologies Corp., 344 Ill. App. 3d at 480), while pure questions

of law are reviewed *de novo* (Carpetland U.S.A., Inc., 201 Ill. 2d at 369; Zebra Technologies

Corp., 344 Ill. App. 3d at 480), giving deference to the Department's interpretation of its

governing statutes and its regulations (see Automatic Data Processing, Inc. v. Department of

Revenue, 313 Ill. App. 3d 433, 443-44, 729 N.E.2d 433 (2000)).

The Illinois Income Tax Act (Act) provides that a corporate taxpayer conducting a

multistate business in Illinois use the formula apportionment method of taxation. 35 ILCS

5/304(a) (West 2002)[2]; Automatic Data Processing, Inc., 313 Ill. App. 3d at 438-39. Under the

formula set forth in section 304(a), three factors, which are calculated in fractions, were used to

---

[2] The Department notes that, starting in 1999, a single factor apportionment method based

solely on sales has been applied. See 35 ILCS 5/304(h), 1501(a)(27) (West 2002).

1-03-1160

apportion income: Illinois property in proportion to all property; Illinois payroll in proportion to all payroll; and Illinois sales in proportion to all sales. 35 ILCS 5/304(a) (West 2002); Automatic Data Processing, Inc., 313 Ill. App. 3d at 439. The sales factor was double weighted. 35 ILCS 5/304(a) (West 2002); Automatic Data Processing, Inc., 313 Ill. App. 3d at 439.

The Act defines business income as "income arising from transactions and activity in the regular course of the taxpayer's trade or business," which includes "income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business." 35 ILCS 5/1501(a)(1) (West 2002); see also Texaco-Cities Service Pipeline Co. v. McGaw, 182 Ill. 2d 262, 267, 695 N.E.2d 481 (1998). Because all of a business's income is presumed to be "business income" (see Borden, Inc. v. Department of Revenue, 295 Ill. App. 3d 1001, 1010, 692 N.E.2d 1335 (1998)), an "entity claiming that its income is nonbusiness income bears the burden of clearly proving this fact" (Texaco-Cities, 182 Ill. 2d at 268).

Mead contends that the income from the Lexis/Nexis sale was nonbusiness income, subject to allocation rather than apportionment, and that apportionment was unconstitutional. The Department counters that apportionment here passes constitutional muster because the requisite nexus to Illinois and rational relationship to Mead's business activities in Illinois existed. We agree.

Under the United States Constitution, the taxpayer must have " 'some minimum connection' " to the taxing body and the tax must be " 'rationally related to "values connected with the taxing [s]tate.." ' " Hercules, Inc. v. Department of Revenue, 324 Ill. App. 3d 329, 335,

-8-

1-03-1160

753 N.E.2d 418 (2001), quoting <u>Quill Corp. v. North Dakota</u>, 504 U.S. 298, 306, 119 L. Ed. 2d 91, 102, 112 S. Ct. 1904, 1909-10 (1992), quoting <u>Moorman Manufacturing Co. v. Bair</u>, 437 U.S. 267, 273, 57 L. Ed. 2d 197, 204, 98 S. Ct. 2340, 2344 (1978).  The due process and commerce clauses of the United States Constitution prohibit a state from taxing value earned "outside its borders" (<u>Home Interiors & Gifts, Inc. v. Department of Revenue</u>, 318 Ill. App. 3d 205, 210, 741 N.E.2d 998 (2000), citing <u>Allied-Signal, Inc. v. Director, Division of Taxation</u>, 504 U.S. 768, 119 L. Ed. 2d 533, 112 S. Ct. 2251 (1992); <u>Hormel Foods Corp. v. Zehnder</u>, 316 Ill. App. 3d 1200, 1203, 738 N.E.2d 145 (2000)), but instead require that there be " ' "some definite link, some minimum connection, between a state and the *** transaction it seeks to tax" ' " (<u>Hercules, Inc.</u>, 324 Ill. App. 3d at 336, quoting <u>Quill Corp.</u>, 504 U.S. at 306, 119 L. Ed. 2d at 102, 112 S. Ct. at 1909, quoting <u>Miller Brothers Co. v. Maryland</u>, 347 U.S. 340, 344-45, 98 L. Ed. 744, 748, 74 S. Ct. 535, 539 (1954)).  States are permitted, however, to tax the multistate income of a nondomiciliary corporation where such minimal connection exists between the taxing state and the corporation's business activities and where a rational relationship exists between " 'the income attributed to the taxing State and the intrastate value of the corporate business.' " <u>Hercules, Inc.</u>, 324 Ill. App. 3d at 336, quoting <u>Allied-Signal, Inc.</u>, 504 U.S. at 772, 119 L. Ed. 2d at 542, 112 S. Ct. at 2255.  Further, the taxpayer has " 'the distinct burden of showing by clear and cogent evidence that [the state tax] results' in the taxation of 'extraterritorial values.' " <u>Hercules, Inc.</u>, 324 Ill. App. 3d at 336, quoting <u>Container Corp. of America v. Franchise Tax Board</u>, 463 U.S. 159, 164, 77 L. Ed. 2d 545, 554, 103 S. Ct. 2933, 2939 (1983).

A state's apportionment of income of a multistate nondomiciliary corporation from a

capital or nontangible transaction is constitutional in two circumstances: where there is a unitary business relationship between the payor and the payee or where the intangible asset served an operational rather than an investment function. Hercules, Inc., 324 Ill. App. 3d at 336; see also Allied-Signal, Inc., 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263. Under the unitary relationship test, a single state may tax all the income earned and apportioned, even where a business has subsidiaries, divisions, or common ownership of other businesses that operate in different jurisdictions, if the businesses have common managerial or operational resources that "produce economies of scale and a substantial sharing of values." Hercules, Inc., 324 Ill. App. 3d at 336; see also Container Corp. of America, 463 U.S. at 179, 77 L. Ed. 2d at 562, 103 S. Ct. at 2947.

Under the operational function test, even where no unitary relationship exists, a state may apportion income when the capital transaction serves an operational function rather than an investment function. Hercules, Inc., 324 Ill. App. 3d at 337, see also Allied-Signal, Inc., 504 U.S. at 787, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263. There, the relevant inquiry focuses on the " 'objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State.' " Hercules, Inc., 324 Ill. App. 3d at 337, quoting Allied-Signal, Inc., 504 U.S. at 785, 119 L. Ed. 2d at 550, 112 S. Ct. at 2262.

Mead does not dispute that Lexis/Nexis had the requisite connection, or nexus, with Illinois. Rather, it contends that taxation of the intangible income, including the gain on goodwill, from the Lexis/Nexis sale was unconstitutional because Mead and Lexis/Nexis were not unitary (as the circuit court found) and because its ownership of Lexis/Nexis did not serve an

operational function, but merely an investment function. In response, the Department argues that the court erred by finding there was no unitary relationship and that, in any event, Mead failed its burden of proving that Lexis/Nexis was not an operational asset. Because we agree with the latter contention, we do not address the Department's claim of error as to the "lack of unitary business" finding.

Here, among its findings of contested facts, the circuit court found that Mead's investment in Lexis/Nexis "did serve an operational purpose, in that Lexis/Nexis represented a significant business segment of Mead." The court recognized that although, according to testimony of two of Mead's witnesses, there was no functional integration of the companies, the court also found it was "not clear that there was no operational purpose." For that conclusion, the court relied upon the fact that Mead considered Lexis/Nexis in its strategic planning, particularly in the allocation of its resources. It concluded that the "operational purpose allowed Mead to limit the growth of Lexis/Nexis if only to limit its ability to expand or to contract through its control of capital investment."

In its challenge to that finding, Mead relies almost exclusively upon Hercules, Inc. and ASARCO Inc. v. Idaho State Tax Comm'n, 458 U.S. 307, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982), which is cited therein. In Hercules, Inc., the court reversed a decision that all capital gains from a second corporation owned by the plaintiff corporation constituted apportionable business income because the court determined there was no operational purpose in the plaintiff corporation's investment in the second corporation. Hercules, Inc., 324 Ill. App. 3d at 343-44. However, the facts of Hercules, Inc. are readily distinguishable from those in the instant case.

There, gain at issue resulted from the plaintiff Hercules Corporation's sale of its minority stake in Himont, which had been formed by Hercules in a joint venture with a foreign corporation. The court rejected the argument that Hercules' investment in Himont served an operational purpose, based in part on Himont's "stand alone" status. Hercules, Inc., 324 Ill. App. 3d at 338. Hercules never owned a majority share of Himont and it did not exercise management control over Himont.

Here, in contrast to Hercules' minority (38.7%) ownership and lack of management control over its subsidiary corporation, Mead was 100% owner of Lexis/Nexis. Although Mead did not have day-to-day control over Lexis/Nexis, its involvement with Lexis/Nexis was more than merely passive. Mead developed Lexis/Nexis by contributing capital support until it become profitable. Further, Mead continued to approve major capital expenditures by Lexis/Nexis. It also manipulated Lexis/Nexis' business organization, treating it as either a division or a corporate subsidiary, depending on what was more beneficial to Mead. Additionally, Mead retained tax benefits and control over Lexis/Nexis' excess cash.

Moreover, in its own 1993 annual report, Mead identified itself as "the developer of the world's leading electronic information retrieval services for law, patents, accounting, finance, news and business information"; likewise, in its 1993 10-K form, Mead described itself as engaged in electronic publishing and included Lexis/Nexis in its discussion of business segments rather than its "investees." Compare Allied-Signal, Inc., 504 U.S. at 788, 119 L. Ed. 2d at 552, 112 S. Ct. at 2263 (company's 20.6% ownership of subsidiary's stock did not establish operational relationship); ASARCO Inc., 458 U.S. at 321-22, 73 L. Ed. 2d at 798-99, 102 S. Ct.

1-03-1160

at 3111-12 (bare majority ownership of stock not enough to show operational relationship in light of lack of ability to control subsidiary).

Mead also relies heavily in its challenge to the court's finding of operational purpose upon its assertion that the court improperly considered the annual report and the 10-K form in making that finding. However, Mead presents no relevant legal authority to support such assertion. Additionally, for the same point, Mead relies upon the testimony of its experts, particularly that of Dr. Ferdinand Schoettle, an economist, and Professor Richard Pomp, a tax law expert. However, experts may not testify with respect to legal conclusions or give testimony amounting to statutory interpretations. LID Associates v. Dolan, 324 Ill. App. 3d 1047, 1058, 756 N.E.2d 866 (2001); Coyne v. Robert H. Anderson & Associates, Inc., 215 Ill. App. 3d 104, 112, 574 N.E.2d 863 (1991). Therefore, Mead has not established that the court's finding of an operational purpose was against the manifest weight of the evidence (see Zebra Technologies Corp., 344 Ill. App. 3d at 480), nor has it established as clearly erroneous the conclusion that the gain was nonbusiness income (see Texaco-Cities, 182 Ill. 2d at 268).

Next, Mead contends the gain was nonbusiness income under Blessing/White, Inc. v. Zehnder, 329 Ill. App. 3d 714, 768 N.E.2d 332 (2002), because it resulted from the liquidation of an entire line of business. The Department responds that Mead did not prove that the gain was not business income.[3] We agree.

_____

[3] We note the Department's citation, as supplemental authority, of the 2004 amendment of the definition of business income in section 1501(a)(1), to now read that "the term 'business income' means all income that may be treated as apportionable business income under the

-13-

1-03-1160

As previously set forth, the Act defines business income as "income arising from transactions and activity in the regular course of the taxpayer's trade or business," which includes "income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business." 35 ILCS 5/1501(a)(1) (West 2002). Two tests, corresponding to the two clauses in section 1501(a) (1), are applied to determine if income from the disposition of a capital asset is "business income." See Texaco-Cities Service Pipeline Co., 182 Ill. 2d at 268. Under the first, the "transactional test," if the income is " 'attributable to a type of business transaction in which [the] taxpayer regularly engages,' " it is business income. Texaco-Cities Service Pipeline Co., 182 Ill. 2d at 269, quoting National Realty & Investment Co. v. Department of Revenue, 144 Ill. App. 3d 541, 554, 494 N.E.2d 924 (1986). Under the second test, the "functional test," all gain from the disposition of a capital asset is considered business income if the asset disposed of was " 'used by the taxpayer in its regular trade or business operations.' " Texaco-Cities Service Pipeline Co., 182 Ill. 2d at 269, quoting National Realty & Investment Co., 144 Ill. App. 3d at 554.

In the instant case, while Mead asserts that the gain did not satisfy either the transactional or the functional test, the conclusion reached as to the former test is undisputed. Therefore, we

Constitution of the United States." 35 ILCS 5/1501(a)(1) (West 2004). The Department contends that the amendment eliminated the language in section 1501(a)(1) that was relied upon in Blessing/White, Inc. to recognize the business liquidation exception to the functional test for business income.

1-03-1160

do not consider the transactional test, but only the functional test. Mead claims that the gain qualifies as nonbusiness income under a "modified" form of the functional test set forth in Blessing/White Inc., 329 Ill. App. 3d 714.

There, the corporate taxpayer sold substantially all its assets, ceased doing business in Illinois, and distributed the proceeds to its individual shareholders. The court held that the functional test is satisfied in such cases only where the property and the liquidation of assets, *i.e.*, the disposition, are essential to the taxpayer's regular trade or operations. Blessing/White, Inc., 329 Ill. App. 3d at 726. Further, the court found significant that the proceeds were "not used to support any ongoing business concerns but, instead, disbursed in their entirety to the company's shareholders." Blessing/White, Inc., 329 Ill. App. 3d at 728.[4]

Here, in contrast, there was no such disbursement to shareholders. Rather, Mead remained in business and reinvested the gain in its ongoing business. Mead paid federal taxes on the gain, then used about one-third of the proceeds to buy back stock and about two-thirds to reduce its debt level. While Mead argues that such actions increased the value of its shares, and thus benefitted its shareholders, we find such contention unpersuasive in this context. Mead

_____

[4] The parties filed an agreed motion, which was granted, to cite as supplemental authority the decision, rendered after the briefs in this case were filed, in American States Insurance Co. v. Hamer, 352 Ill. App. 3d 521, 816 N.E.2d 659 (2004). In that case, the gain from the sale of a foreign corporation was properly treated as a deemed sale of assets, or nonbusiness income, rather than apportionable business income. American States Insurance Co. v. Hamer, 352 Ill. App. 3d at 532.

-15-

1-03-1160

reduced its debt levels and the company's long-term debt to capital ratio from 46% to 30.5%, and, using the Lexis/Nexis sale gain, increased its working capital to $807 million compared to $380 million the previous year. Further, unlike the Department's treatment of the taxpayer as two separate corporations under section 338(h)(10) of the Internal Revenue Code in American States Insurance Co., 352 Ill. App. 3d at 531-32, the Department here claimed that Mead and Lexis/Nexis were unitary.

Mead also relies upon cases from foreign jurisdictions for its contention that the business liquidation exception should apply here. See, *e.g.*, Lenox, Inc. v. Tolson, 353 N.C. 659, 548 S.E.2d 513 (2001); Laurel Pipe Line Co. v. Commonwealth, 537 Pa. 205, 642 A.2d 472 (1994); May Department Stores Co. v. Indiana Department of State Revenue, 749 N.E.2d 651 (2001). For its part, the Department, recognizing its failure to raise such argument before the court below normally would result in waiver of the issue, nonetheless contends that Blessing/White, Inc. is contrary to Illinois law and provides inconsistent precedent with the "business liquidation exception" to the functional test for business income. On that basis, it asks this court to address that doctrine. However, having concluded that the Lexis/Nexis sale does not fall within the business liquidation exception, set forth in Blessing/White, Inc., to the functional test for business income, we need not consider foreign authorities or address the validity of the business liquidation exception. Rather, because Mead reinvested the sale proceeds in its ongoing business, the court properly concluded that the gain satisfied the functional test and was properly identified as business income.

Finally, Mead contends that the inclusion of the Lexis/Nexis sale gain in its Illinois

apportionable business income is unconstitutional because it is disproportionate to Mead's activities in Illinois. The Department responds that Mead never sought alternative apportionment (see 35 ILCS 5/304(f) (West 2002) (party seeking alternative apportionment must petition Director for it)) and that Mead has not proved by the clear and cogent evidence required that the income attributable to Illinois is " 'out of all appropriate proportions to the business transacted' " in Illinois (Container Corp. of America, 463 U.S. at 170, 77 L. Ed. 2d at 556, 103 S. Ct. at 2942, quoting Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell, 283 U.S. 123, 135, 75 L. Ed. 879, 908, 51 S. Ct. 385, 389 (1931)). We agree and note the Department's point that, in the case upon which Mead relies almost exclusively, Hans Rees' Sons, Inc. v. North Carolina ex rel. Maxwell, 283 U.S. 123, 75 L. Ed. 879, 51 S. Ct. 385 (1931), a challenge to the three-factor formula (like the one used by the Department) was rejected by the United States Supreme Court, which held that such formula does not distort income attributable to the State. Container Corp. of America, 463 U.S. at 182-84, 77 L. Ed. 2d at 564-65, 103 S. Ct. at 2949-50 (no unconstitutional distortion even where combined apportionment converted net losses into substantial profits). See also Penzoil Co. v. Department of Revenue, 332 Or. 542, 550 n.4, 33 P.3d 314, 318-19 n.4 (2001) (finding "Hans Rees' is of limited value" in the states using a multifactor apportionment).

Moreover, as the Department maintains, Mead did not establish that either it or Lexis/Nexis did not do substantial business in Illinois. As the Department notes, Mead's 1994 tax return indicates that the contrary is true: Mead reported Illinois sales of more than $338 million, of which over $46 million were attributable to Lexis/Nexis. Mead also relies upon a

conclusion by its accounting expert, Kennion Yano, of distortion, but that testimony was considered by the circuit court, along with the auditor's criticism of Yano's evidence. The court ultimately struck Yano's conclusion. Mead has not proven clearly and cogently that the apportionment of the Lexis/Nexis gain was grossly disproportionate to its Illinois income or activities. For the reasons stated above, Mead has not established as clearly erroneous the court's conclusion that the gain from the sale of Lexis/Nexis was apportionable business income.

Mead also contends that the gross receipts from the sale of financial instruments should be included in the calculation of its sales factor on its 1994 Illinois tax return.

This issue of whether the Department properly excluded from the sales factor denominator the $4.8 billion that Mead reported in gross receipts of financial instruments was decided on the parties' cross-motions for summary judgment. Accordingly, because the issue was resolved on motions for summary judgment, which is granted where the pleadings, depositions, admissions, and affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, review is *de novo*. 735 ILCS 5/2-1005(c) (West 2002); Arangold Corp. v. Zehnder, 204 Ill. 2d 142, 146, 787 N.E.2d 786 (2003).

As previously noted, section 304 of the Act, which governs business income of persons other than residents, provides in subsection (a) an apportionment formula for corporations conducting business in Illinois. 35 ILCS 5/304(a) (West 2002). As set forth in section 304(a), one of the factors used in calculating this formula is the "sales factor," which is "a fraction, the numerator of which is the total of sales of the person in this State during the taxable year, and the denominator of which is the total sales of the person everywhere during the taxable year." 35

1-03-1160

ILCS 5/304(a)(3)(A) (West 2002). Section 304 also explicitly allows for alternative allocation upon petition of either the taxpayer or the Director of the Department if the apportionment provisions "do not fairly represent the extent of [the taxpayer's] business activity in this State." 35 ILCS 5/304(f) (West 2002).

Mead relies on the definition in section 1501(a)(21) of the Act which states that " 'sales' means all gross receipts of the taxpayer not allocated under Sections 301, 302, and 303" (35 ILCS 5/1501(a)(21) (West 2002)) for its claim that the gross receipts from the sale of financial instruments should be included in the calculation of its sales factor on its 1994 Illinois tax return.

Yet, section 1501 ("Definitions") provides generally that the stated definition applies "in this Act, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof" (35 ILCS 5/1501(a) (West 2002)), but, as noted, section 304, which addresses the "sales factor," explicitly allows for alternative allocation upon petition of either the taxpayer or the Director (35 ILCS 5/304(f) (West 2002)). Although "sales," then, may mean all gross receipts of the taxpayer that otherwise qualify as business income (see 35 ILCS 5/1501(a)(21) (West 2002)), under the standard apportionment formula, section 304 explicitly provides for modification of the apportionment provisions (35 ILCS 5/304(f) (West 2002)); therefore, we reject Mead's argument that the plain language of the statute requires the inclusion of the disputed gross receipts in the calculation of the sales factor.

Rather, in accordance with the authority granted by section 304(f), section 100.3380 of

1-03-1160

the Department's regulations was enacted. See 86 Ill. Adm. Code §100.3380 (1996).[5] Section

100.3380(b)(6) provides special rules for computing the sales factor; one of those rules governs

the sale of business intangibles and provides that "[i]n the case of sales of business intangibles

*** gross receipts shall be disregarded and only the net gain (loss) therefrom shall be included in

the sales factor." 86 Ill. Adm. Code §100.3380(b)(6) (1996).

Mead asserts that the Department cannot "circumvent" the meaning of the statute by

adopting a regulation. However, the Department has proper authority to make reasonable

regulations, which have the force and effect of law. Exhibits, Inc. v. Sweet, 303 Ill. App. 3d 423,

427, 709 N.E.2d 236 (1998). The regulation, which is construed under the same standards

governing the construction of statutes, is presumed to be valid, and the burden of establishing the

regulation is unconstitutional is charged to the party challenging its validity. Exhibits, Inc., 303

Ill. App. 3d at 427.

In its challenge to the validity of the regulation at issue, Mead relies primarily upon the

testimony of its experts and a general principle concerning administrative rules. See Canteen

Corp. v. Department of Revenue, 123 Ill. 2d 95, 108, 525 N.E.2d 73 (1988) (administrative rules

can neither limit nor extend the scope of a statute).[6] While the Department questions the

---

[5] The Department notes that, in 2002, section 100.3380 was amended to state more

explicitly that it was enacted in fulfillment of section 304(f) of the Act. See 26 Ill. Reg. 15304,

15314 (eff. October 9, 2002), codified, at 86 Ill. Adm. Code §100.3380.

[6] We note the additional foreign authority cited by the Department, including its

supplemental authority, Toys "R" Us, Inc. v. Franchise Tax Board, 138 Cal. App. 4th 339, 41

competency of the testimony of Mead's experts (see, *e.g.*, <u>LID Associates</u>, 324 Ill. App. 3d at 1058), we do not find Mead's argument persuasive and, in any event, believe that section 304(f) of the Act and section 100.3380 were correctly applied here.

Again, section 304(f) explicitly provides for modification of the apportionment provisions to avoid unfair representation of the extent of the taxpayer's business activity in Illinois. 35 ILCS 5/304(f) (West 2002). The inclusion of the gross receipts from the sale of financial instruments in Mead's sales factor denominator would not have resulted in a fair representation of its business activity; the gross receipts add approximately $4.8 billion to Mead's sales factor denominator when it actually earned only about $1.9 million on those investments. Accordingly, we believe summary judgment was properly granted in favor of the Department on this issue.

Therefore, we affirm the judgment of the circuit court as set forth in its orders of December 2, 2002, and March 18 and 25, 2003.

Affirmed.

McNULTY and O'MALLEY, JJ., concur.

---

Cal. Rptr. 3d 285 (2006), <u>Microsoft Corp. v. Franchise Tax Board</u>, 39 Cal. 4th 750, 139 P.3d 1169, 47 Cal. Rptr. 3d 216 (2006), and <u>General Motors Corp. v. Franchise Tax Board</u>, 39 Cal. 4th 773, 139 P.3d 1183, 47 Cal. Rptr. 3d 233 (2006), in support of the exclusion of the gross receipts from the sale of financial instruments from the taxpayer's sales factor denominator.